## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

Estate of Grace Levin Wright,           )
by and through Leonard Wright           )      Civil Action No.
as the Personal Representative,         )      1:11-md-002218-TWT
                                        )
Plaintiff,                              )
                                        )
                                        )
v.                                      )
                                        )
                                        )
UNITED STATES OF AMERICA, )
Defendant.                              )
------------------------------------------------

## AMENDED COMPLAINT FOR PERSONAL INJURY
## UNDER THE FEDERAL TORT CLAIMS ACT

The Plaintiff, Leonard Wright, in his fiduciary capacity as Personal
Representative of the Estate of Grace Levin Wright would respectfully show
unto this Court:

### Parties

1.     Grace Levin Wright was a citizen of the United States of America and
resided in the State of South Carolina. Ms. Wright resided at Camp Lejeune
as a dependent child from approximately 1959-1961 and returned prior to
her father's discharge in June 1968. During that time, water supplied to her
for drinking and bathing by the Defendant was contaminated and polluted as

described below. As a result, Ms. Wright was diagnosed with cancer, among other illnesses, and passed away on January 30, 2012. The Plaintiff, Leonard Wright, is the duly appointed Personal Representative of the Estate of Grace Levin Wright, having been appointed on Mary 23, 2012 by the Berkeley County Probate Court.   This suit is filed on behalf of the heirs of the decedent, Grace Levin Wright.

2.      The Defendant, United States of America, through its military branches the United States Navy and the United States Marine Corp, has owned and operated Camp Lejeune as a Marine Corp base since 1941. The Defendant's employees at all times were acting within the scope of their office or employment with respect to the negligent actions and omissions alleged.

3.      That Defendant is liable for damages caused to Plaintiff, under the Federal Tort Claims Act, 28 U.S.C. §§ 1346, 2671-80 *el seq.*, as a result of the acts and omissions complained of herein, which were performed by agents, servants and/or employees acting within the course and scope of their employment with Defendant.

## Jurisdiction and Waiver of Sovereign Immunity

4.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1346(b)(1) because the Plaintiff seeks to recover money damages for

personal injury caused by the wrongful acts and omissions of employees of the government while acting within the scope of their office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred. A private person under the law of North Carolina would be liable for negligently supplying the Plaintiff with drinking water that was hazardous to human health and that proximately caused her injuries under the circumstances alleged in this Complaint. The Plaintiff timely filed a claim pursuant to the requirements of the Federal Tort Claims Act, as evidenced by the filed Standard Form 95 attached as Exhibit A, and more than six months has elapsed since filing of said claim, thereby establishing jurisdiction in this honorable Court pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2675.

5.      That the acts and omissions complained of herein by Defendant occurred within the State of North Carolina, thus rendering jurisdiction and venue proper within United States District Court for the Eastern District of North Carolina pursuant to 28 U .S.C. § 1402(b). This case was initially filed with the United States District Court for the Eastern District of North Carolina, and was subsequently transferred to the Northern District of Atlanta as part of MDL No. 2218.

6.     That at all times relevant to the allegations contained within this Complaint, Defendant owned, controlled, and/or operated the Camp Lejeune Marine Corp. military base, which was and continues to be located on the eastern shore of North Carolina and which housed hundreds-of-thousands of military personnel and their families during the relevant time period; it also employed thousands of civil employees as well.

7.     That at all times relevant hereto, Defendant was responsible for doing whatever was necessary to provide a water supply that was uncontaminated and was otherwise safe for drinking, bathing, and for all other purposes for all occupants of Camp Lejeune and any other persons reasonably foreseen to use the aforementioned water supply for personal use, contact, and/or consumption.

8.     That at all times relevant hereto, Defendant was responsible for maintaining, inspecting, and otherwise providing that the property which it owned, controlled, and/or operated at Camp Lejeune did not have dangerous and/or hazardous contaminants or pollutants in the water supply or contaminants or pollutants that could leech into the water supply system that was expected to be used by human beings, regardless of the source of such contaminants or pollutants.

9.     That at all times relevant hereto, Defendant was required to maintain and otherwise provide a water supply system that was in compliance, not only with due care, but also with any and all federal, state, and/or all applicable military regulations, orders, procedures, instructions or standards to ensure the health, safety and welfare of all individuals that were reasonably foreseeable to consume or become physically exposed to said water supply system.

## Defective Improvements to Real Property

10.     The water-supply facilities at Camp Lejeune, including the wells, underground piping and delivery systems, and water treatment plants, are improvements to real property under North Carolina law.

11.     The Defendant elected to construct its own water-supply facilities at Camp Lejeune, to include wells, underground piping and delivery systems, and water treatment plants. The Defendant dug numerous wells to supply drinking water, built water treatment facilities, and constructed numerous pipes to carry water from the wells to the water treatment plants and thereafter to residents, businesses, and military operations throughout the base.

12.    The water-supply facilities utilized deep water wells that tapped into the underground aquifer that had been contaminated by the leaking of toxic and hazardous materials from various sources.

13.    Over-pumping of the base's water wells sucked fuel that had leaked from the Fuel Farm and other contaminants into the deep aquifers. The contaminated ground water in turn leached toxic chemicals into the walls of the water supply wells serving the Tarawa Terrace water distribution system. The drinking water flowed from the wells into the Tarawa Terrace water treatment plant. The Defendant's employees failed to treat the contaminated water to remove the impurities and instead allowed it to flow directly to residences and businesses of persons living and working in the area.

14.    As stated above, the water-supply facilities at Camp Lejeune are defective "improvements to real property" within the meaning of N.C. Gen. Stat. § 1-50(a)(5)(a) because:

   (a) the Defendant is both the owner and operator of the land where these improvements are located, and the Defendant's employees are the persons who constructed, installed, repaired and maintained the improvements;

   (b) the improvements are permanent structures installed on the land and are attached to the realty as to make removal extremely difficult;

6

(c) the Defendant intended the improvements to be permanent structures on the land; and

(d) this intent was manifested to the Plaintiff and other third parties by the physical facts and outward appearances of the water supply facilities, to include wells and water treatment plants, all of which appear to be permanent structures.

15.    The Defendant was in actual possession and control of the water-supply facilities on base, including the wells, underground piping and delivery systems, and water treatment plants, at the time the Plaintiff was exposed to and  ingested the water that caused her illnesses.

16.    The "Water-Supply Facilities" at Camp Lejeune was constructed and installed as a permanent improvement to the Camp Lejeune property, and under North Carolina law is considered an "Improvement to Real Property". When the system began processing toxic and hazardous water from the underground aquifer, it would be classified as a "Defective Improvement to Real Property."

### Statute of Repose

17.    The claims asserted herein are timely under North Carolina law. As stated above, the water-supply facilities at Camp Lejeune are defective "improvements to real property" within the meaning of N.C. Gen. Stat. § 1-

50(a)(5)(a). Because the water-supply facilities are defective improvements to real property within the meaning of N.C. Gen. Stat. § 1-50(a)(5)(a), the ten year statute of repose contained in N.C. Gen. Stat. § 1-52(16) is preempted and does not apply to this case.

18.     Since the Plaintiff's injuries were caused by a defective or unsafe condition to improvements to real property with in the meaning of N.C. Gen. Stat. § 1-50(a)(5), § 1-50(a)(5)a provides that these claims must be brought within six years of the last act or omission giving rise to the cause of action and substantial completion of the improvement. There are, however, two exceptions to this repose period in N.C. Gen. Stat. § 1-50(a)(5)d & N.C. Gen. Stat. § 1-50(a)(5)e that will bar the Defendant from asserting this defense.

19.     The Defendant is barred from asserting the repose period in § 1-50(a)(5)a if the Defendant is in actual possession or control of the property and is charged with knowledge of the defective or unsafe condition at the time the condition causes injury. N.C. Gen. Stat. § 1-50(a)(5)d specifically states "[t]he limitation prescribed by this subdivision shall not be asserted as a defense by any person in actual possession or control, as owner, tenant or otherwise, of the improvement at the time the defective or unsafe condition constitutes the proximate cause of the injury or death for which it is

8

proposed to bring an action, in the event such person in actual person either knew, or ought reasonably to have known, of the defective or unsafe condition."

20.     Secondly, under section N.C. Gen. Stat. § 1-50(a)(5)e, a Defendant falling within any of the following classes likewise cannot raise the statute of repose defense: "The limitation prescribed by this subsection shall not be asserted as a defense by any person who shall have been guilty of fraud, or willful or wanton negligence in furnishing materials, in developing real property, in performing or furnishing the design, plans, specifications, surveying, supervision, testing, or observation of construction, or construction of an improvement to real property, or a repair to an improvement to real property, or to a surety or a guarantor of any of the foregoing persons, or to any person who shall wrongfully conceal any such fraud, or willful or wanton negligence."

21.     The Defendant was in actual possession and control of the water-supply facilities at the time the Plaintiff ingested the water that caused her illnesses.

22.     In addition, the Defendant knew, or should have known,, that the water supplied to the Plaintiff was hazardous to human health and carcinogenic because the Defendant knew pollutants had contaminated the

9

water supply, was obligated to make sanitary surveys and testing of the

water quality by the BUMED, and owed a continuing duty under North

Carolina law to inspect and maintain the premises and discover the defective

condition of water-supply facilities and drinking water. Because the Plaintiff

was injured by the defective condition of the improvements to real property

that contaminated the drinking water, a private person  pursuant to N.C.

Gen. Stat. § 1-50(a)(5)d could not raise the statute of repose contained in

N.C. Gen. Stat. § 1-50(a)(5)a.

23.     In the alternative, the Defendant's employees engaged in willful or

wanton negligence in operating the water-supply facilities as to allow these

improvements to real property to contaminate the drinking water supplied to

the Plaintiff. Even after the Defendant knew that the toxic and hazardous

chemicals had leaked into the ground and the underground aquifer, the

Defendant wrongfully concealed from the Plaintiff that the water supplied to

her was hazardous to her health. A private person pursuant to N.C. Gen.

Stat. § 1-50(a)(5)(e) would be barred from raising the statute of repose

contained in  N.C. Gen. Stat. § 1-50(a)(5)(a) under these circumstances.

24.     Because a private person under like circumstances would be barred

from raising the statute of repose, the Defendant is likewise barred. The

Defendant has waived sovereign immunity for the claims asserted therein

pursuant to 28 U.S.C. § 2674(a) insofar as a private person would be liable for the negligence alleged under like circumstances.

## Violations of BUMED 6240.3

25.    Attached as Exhibit B and Exhibit C to this Complaint are true copies of the Department of the Navy, Bureau of Medicine and Surgery, known as BUMED Instruction 6240.3B and BUMED Instruction 6240.3C, which at all pertinent times herein were in effect and required to be followed by Defendant at various Navy bases and facilities, including Camp Lejeune.

26.    The BUMEDs, Exhibits B and C, created and mandated a duty on the part of the command staff, agents, servants and employees of Defendant at Camp Lejeune.

27.    BUMED 6240.3B and C, Exhibits B and C, as applicable to various Naval bases, including Camp Lejeune, mandated that the water supply had to be adequate in capacity to meet maximum demands without creating health hazards, to be located, designed and constructed to eliminate or prevent contamination or pollution and to be conscientiously operated by well-trained and competent personnel whose qualifications were commensurate with the responsibilities of their positions.

28.    The definition of a health hazard as mandated by BUMED 6240.3B and C, Exhibits B and C, means any condition, devices or practices in the

11

water supply system and its operation, including structural defects, whether in the design, or construction, which create, or may create a danger to the health and well-being of the water consumer, which included all those persons reasonably expected to be drinking and bathing in the water at Camp Lejeune, including Plaintiff.

29.   BUMED 6240.3B and C, Exhibits B and C at all pertinent times mandated, among other things, that a health hazard was to be considered by employees, agents and servants of Defendant to mean any defects in the location, design, or construction of the water supply system, which may regularly or occasionally prevent satisfactory purification of the water supply or cause it to be polluted from extraneous sources, even if the physiological effects of the pollutants or contaminants were not known.

30.   The said BUMEDs, Exhibits B and C, mandated and required the command staff, agents, servants and employees of Defendant at Camp Lejeune to ensure that the water supply be obtained from the most desirable source feasible, that efforts be made to control contaminants or pollution of the source and that if the source were not protected adequately by natural means, that it be adequately protected by treatment.

31.   The said BUMEDs, Exhibits B and C, mandated and regulated the command staff at Camp Lejeune to take affirmative steps to make frequent

sanitary surveys to locate and identify health hazards which might exist in the water supply system.

32.     The said BUMEDs, Exhibits B and C, mandated and regulated a duty to enforce rules and regulations to prevent the development of health hazards in the water supply system, to adequately protect the water quality throughout all parts of the system, as demonstrated by "frequent surveys", to see that there is a proper operation of the water supply under the "responsible" charge of personnel, to ensure adequate capacity to meet peak demands in the water supply without the development of health hazards, and to record the laboratory examinations to demonstrate consistent compliance with the water quality requirements of these standards.

33.     Rather than pipe in water from local municipalities, the Defendant elected to construct its own water-supply facilities at Camp Lejeune, to include wells and water treatment plants located throughout the base. The Defendant dug numerous wells to supply drinking water, built water treatment facilities, and constructed numerous pipes to carry water from the wells to the water treatment plant and thereafter to residents, businesses, and military operations throughout the base.

34.     In building and maintaining these water-supply facilities, the Defendant's employees were required to follow a specific course of action

mandated by the BUMED 6240.3C, which became effective on August 25, 1972, to ensure that the drinking water provided was safe for human consumption.

35.     BUMED 6240.3C 6 imposed a specific course of action on the Defendant if a water source was not protected from "pollution" by natural means - the Defendant was required to protect the water supply by treatment. The Defendant also was required to make frequent sanitary surveys to identify health hazards in the system:

> a. The water supply should be obtained from the most desirable source which is feasible, and effort should be made to prevent or control pollution of the source. If the source is not adequately protected by natural means, the supply shall be adequately protected by treatment.
>
> b. Frequent sanitary surveys shall be made of the water supply system to locate and identify health hazards which might exist in the system.

BUMED 6240.3C 6(a) & (b).

36.     BUMED 6240.3C 7 imposed mandatory water quality standards on the Defendant. These standards included a flat prohibition on allowing drinking water to contain substances hazardous to the health of consumers:

> d. Chemical Characteristics (Limits). Drinking water shall not contain impurities in concentrations which may be hazardous to the health of the consumers....Substances which may have deleterious physiological effects, or for which physiological

effects are not known, shall not be introduced into the system in
a manner which would permit them to reach the consumer.

BUMED 6240.3C 7(d).

37.     As part of the construction of Camp Lejeune, the Defendant

constructed all water-supply facilities on base which collected water

from deep water wells and treated, tested, and approved for human

consumption the final water product that was suppose to comply with

the standards set forth above.

38.     The Defendant negligently, carelessly and recklessly permitted

toxic and hazardous substances to leak into the ground from various

sources. In violation of BUMED 6240.3C 7(d), the Defendant

negligently, carelessly and recklessly allowed or caused (failed to

prevent) contaminants to seep into the aquifer and to drain into the

drinking wells. The toxic and hazardous chemicals made the water

unreasonably dangerous for human consumption.

39.     The contaminated ground water in turn leached toxic and hazardous

chemicals into the walls of the water supply wells serving the water

distribution systems at Camp Lejeune. The drinking water flowed from the

wells into the water treatment plants.  The Defendant's employees in

violation of BUMED 6240.3C 6(a) negligently failed to treat the

contaminated water to remove the impurities and instead allowed it to flow

15

directly to residences and businesses of persons living and working in the area.

40.     The Defendant's employees in violation of BUMED.6240.3C 6(b) negligently also failed to conduct sanitary surveys and tests to determine if the drinking water supplied by the water-supply facilities (to include its wells and water treatment plant) to consumers contained substances that would be hazardous to human health.

41.     Attached as Exhibit D is a Base Order effective at all pertinent times herein that commanded and directed command personnel, agents, servants and employees of the Defendant to cause periodic inspections to be made of contaminants and hazardous materials in stock and to take steps to avoid improper practices of disposal that may contaminate, among other things, the drinking water at Camp Lejeune.

42.     That at all pertinent times Defendant, through its agents, servants and employees, acting within the course and scope of their employment, negligently, carelessly and recklessly failed to follow their mandate and failed to exercise due care by causing or allowing various pollutants and contaminants, such as tetrachloroethylene, trichloroethylene, dicloroethylene, vinyl chloride, and benzene to exist in the base water supply in quantities that Defendant knew or should have known were dangerous to

the life, health and welfare of those to whom they were supplying the water, including Plaintiff Grace Levin Wright.[1]

## DUTY TO WARN

43.   That subsequent to Defendant's knowing or having reason to know that said water

supply was contaminated or polluted with potentially dangerous and/or hazardous chemicals, that Defendant had the duty to warn the consumer to whom it was supplying said water, even if the physiological effects were uncertain or unknown.

44.   Attached as Exhibit E (best copy currently available to Plaintiff), is a true copy of Defendant's report of a surveillance performed for the detection of trihalomethane in the water supply of Camp Lejeune. Trihalomethane is an expected by-product of the chlorination treatment of a water supply.  This report alerted the base command that the water was so highly contaminated with other chemicals that the values of trihalomethanes could not even be determined but only estimated because of the presence of the pollution or contaminants.

45.   Attached as Exhibit F is a true copy of Defendant's report of January 1981   reporting   to   the   base   command   at   Camp   Lejeune   that   the

---

[1] Upon information and belief, Defendant's acts and/or omissions caused its water supply to be contaminated by hundreds of thousands of gallons of raw gasoline and diesel fuel.

trihalomethanes could not even be measured at all because of the presence of heavy organic chemicals and alerted the base command of the need to analyze for chlorinated organics, such as tetrachloroethylene, trichloroethylene, dicloroethylene, and vinyl chloride.

46.     Attached as Exhibit G is a true copy of Defendant's report, again alerting the base command at Camp Lejeune that the water supply was "highly contaminated with other chlorinated hydrocarbons (solvents)!" Defendant, through its agents, servants and employees, acting with the course and scope of their employment, negligently, carelessly and recklessly failed to follow the mandated responsibilities, as well as those responsibilities required by due care, to conduct an investigation of the report by qualified personnel and to conduct frequent surveys, to enforce regulations, orders, procedures, instructions, and/or standards and to take all reasonable steps to make sure that the contaminants even from extraneous sources did not pose a potential danger to the health and well being of the persons expected to use that water, including Plaintiff herein.

47.     Attached as Exhibit H is a report of the Grainger Laboratories, an independent contractor hired by Defendant, alerting the command staff at Camp Lejeune that when they tried to conduct the monthly test for trihalomethane (an expected by product of chlorination) they also were

hampered by what was thought to be a chlorinated organic substance and that "[t]hese appeared to be at high levels and hence more important from a health standard than the total trihalomethane content."

48. As evidenced by at least Exhibits E, F, and G herein, the base command already

knew for at least a year and a half before the Grainger report of the high concentrations of contaminants that presented a health hazard to the persons expected to use the water supply, but carelessly, negligently, and recklessly failed to take the necessary steps to warn, examine, survey, protect and/or take reasonable steps to provide a safe water system to the consumer personnel at Camp Lejeune, including Plaintiff herein.

49. The Command was advised, through said Grainger Report of August 10, 1982, that the source of the dangerous contamination and pollution was the well fields owned and operated by Defendant.

50. At all times relevant, agents, servants, and/or employees of Defendant, acting within the course and scope of their employment, in addition to allowing pollutants and contaminants into the water supply system from other sources, caused or permitted large quantities of chlorinated solvents and other contaminants to be dumped and disposed of within Camp Lejeune property surreptitiously and under the cover of

darkness and under the guise of training exercises for firemen, in addition to negligently and recklessly permitting spills and drum disposal and solvent disposal practices from off-base facilities, without providing notice or warnings to consumers that they were being exposed to the dangerous and/or potentially poisonous substances that Defendant knew or should have known were leeching into the aforementioned water supply system.

51.   At all times relevant, Defendant knew or should have known that providing water with contaminants, including chlorinated solvents, regardless of the source, would likely cause a variety of health problems, including but not limited to cancers, liver and kidney damage, autoimmune deficiencies, central nervous system disturbances in humans, disfigurement, pain, suffering and possibly death to the people to whom Defendant provided said water system.

52.   That in or about November 1979, Defendant, through its Environmental Protection Agency published a Suggested No Adverse Reaction level for trichloroethylene of no more than 75 parts per billion in a water supply. A true copy is attached hereto as Exhibit I.

53.   In or about or about April, 1980, Defendant, through its Environmental Protection Agency, published a Suggested No Adverse Reaction Level for perchloroethylene (another name for

Tetrachloroethylene) for long term exposure not to exceed 20 parts per billion in a water supply system. A true copy is attached hereto as Exhibit J.

54.     Defendant's Environmental Protection Agency's Suggested No Adverse Reaction Levels for perchloroethylene and trichloroethylene, regardless of whether they were "legally" binding, along with other publications, and mandates, procedures or standards, such as the said BUMEDs, Exhibits B and C, actively or constructively, put the base command on further notice that the exceedingly high levels of contaminants and pollution in the water supply system would likely and foreseeably cause harm to the people to whom they were supplying the subject water.

55.     In fact, when the tap water was tested in or about May of 1982, the trichloroethylene level in the Hadnot Point area of Camp Lejeune was as high as 140 parts per billion (Exhibit H herein) and in July 1982 in Tarawa Terrace, a residential area of Camp Lejeune there were 104 parts per billion of tetrachloroethylene in the water supply.

56.     When the testing was performed in or about February of 1985, the trichloroethylene in the water supply system was as high as 1148 parts per billion and, the dichloroethy lene level as high as 406 parts per billion in the Berkley Manor Elementary School area of Camp Lejeune and the tetrachloroethylene was 215 ppb, with one well supplying the water to

consumers at Camp Lejeune having 18,900 ppb of trichloroethylene, 400 parts per billion of perchloroethylene, 8,070 parts per billion of dichloroethylene and 655 parts per billion of vinyl chloride.

57.    That at no time did Defendant warn the individuals at the base or those coming onto the base that would be reasonably expected to use that water, that said water supply could and/or would potentially harm them and their families.

58.    Attached as Exhibit K is a true copy of a Notice to Residents of Tarawa Terrace, an area of Camp Lejeune, that there was a problem "supplying enough water" because two wells were taken off the line because "minute (trace) amounts of several organic chemicals have been detected in the water."

59.    The said Notice, Exhibit K, was in itself an act of negligence, carelessness, and recklessness on the part of the base command staff in that it affirmatively ignored a duty to warn the users of the subject water of exceedingly high levels of pollutants or contaminants while engendering detrimental reliance on the part of the consumers of the water by stating that the pollutants and contaminants existed only in "minute" or "trace" amounts when the command staff knew or should have known that the levels and nature of the pollutants and contaminants were so exceedingly high they

22

could cause, among other illnesses, kidney and liver damage, damage to the central nervous system, disfigurement in fetuses, cancer and other potential health problems and/or death.

60.     That Defendant's Agency for Toxic Substances and Disease Registry, a statutorily created agency, an operating division within the Department of Health and Human Services, at the direction and/or request of Defendant's Department of Defense, revealed to the public that for a thirty year period, extending at least from 1957 through 1987, the level of chlorinated solvents exceeded Navy regulations, procedures or standards, instructions, and was at times hundreds, and sometimes thousands of times, greater than levels known by Defendant to be the acceptable and safe levels for use by human beings.

61.     That Defendant failed and/or refused to notify the people exposed to the contaminated water of their potentially dangerous exposures and the nature and extent of the potential health issues relating thereto and that even after the Defendant publicly revealed the extent of the levels of the said pollutants and contaminants as being present in the water at least from 1957 through 1987, exposing people at the base to exceedingly dangerous levels, it failed again to notify persons who may have been in contact with the subject water.

62.    That the Defendant, through its agents, servants, and/or employees, acting within

the course and scope of their employment, including but not limited to the National Center for Environmental Health at the Centers for Disease Control and Prevention through the Department of Health and Human Services, erroneously, negligently, carelessly and with reckless indifference continues to this day in efforts to instill confidence in those exposed to the pollutants and contaminants that there is either an improbable or no causal link between the excessive contamination presented by chlorinated solvents and their illnesses, including, but not limited to cancers, liver and kidney damage, autoimmune deficiencies, damage to the central nervous system, disfigurements, and even in some cases death.

## Willful and Wanton Negligence

63.    Even after warnings to Defendant by contracted sources, one of the major sources of the contamination was concealed from affected consumers including the Plaintiff by the Defendant until late 2012. Prior to 2012, the Defendant publicly blamed a privately-owned dry cleaners, ABS One Hour Cleaners, for the release of contaminants at Camp Lejeune. It was not until December 2012 that the ATSDR revealed the conclusions of RCRA investigations of leaking above-ground storage tanks (ASTs) and

underground storage tanks (USTs), which occurred at approximately 70 locations throughout the Hadnot Point study area.

64.     In December 2012, the ATSDR released its "Analyses and Historical Reconstruction of Groundwater Flow, Contaminant Fate and Transport, and Distribution of Drinking Water Within the Service Areas of the Hadnot Point and Holcomb Boulevard Water Treatment Plant and Vicinities, U.S. Marine Corps Base Camp Lejeune, North Carolina – Chapter D: Occurrence of Selected Contaminates in Groundwater at Above-Ground and Underground Storage Tank Sites," which discusses the occurrence of specific contaminants in groundwater at above-ground and underground storage tanks at Camp Lejeune during the estimated period of water contamination from approximately 1957 to 1987. During that time, petroleum, oils, and lubricants (POLs) – including gasoline, waste oil, diesel, heating oil, and jet fuel were stored in unmonitored, single-walled underground storage tanks. Over time, these underground storage tanks rusted and leaked, thereby contaminating surrounding groundwater.

65.     The Defendant did not release any of its findings that the Hadnot Point Fuel Farm was a source of contamination until December 2012. Prior to this time, very limited, if not false, information regarding the source of

contamination was provided to the public, to include military members, dependents, and other potential victims.

66.   At all times relevant hereto, Defendant was required to maintain Hadnot Point Fuel Farm and its water-supply facilities at Camp Lejeune in a manner that was compliant, not only with due care, but also with any and all federal, state, and/or all applicable military regulations, orders, procedures, instructions or standards to ensure there were no defects and/or leaks that would interfere with the health, safety and welfare of all individuals that were reasonably foreseeable to consume or become physically exposed to the water supply systems. For years, the Defendant fraudulently concealed and misled the source of the contamination at Camp Lejeune. It was not until 2012 that the Defendant released any information regarding the Hadnot Point Fuel Farm.

67.   At all pertinent times Defendant, through its agents, servants and employees, acting within the course and scope of their employment, was fraudulent and willfully and wantonly negligent in failing to follow their mandate and failed to exercise due care by causing or allowing various pollutants and contaminants, such as trichloroethylene (TCE), as well as PCE and refined petroleum products, such as benzene, toluene, ethylbenzene, and xylenes (BTEX) to leak and contaminate the base water

supply in quantities that Defendant knew or should have known were dangerous to the life, health and welfare of those to whom they were supplying the water, including Plaintiff herein.

68.    Subsequent to Defendant's knowing or having reason to know dangerous and/or hazardous chemicals were being released, Defendant had the duty to warn the consumer to whom it was supplying said water, even if the harmful effects were uncertain or unknown.

69.    As stated above, the base command already knew as early as 1979 of the possibility of contaminants leaking from the water system, i.e., defective improvements to real property, and the potential health hazard to the persons expected to use the water supply, but was fraudulent and willfully in concealing the contamination and the threat to human health and wantonly negligent in failing to take the necessary steps to warn, examine, survey, protect and/or take reasonable steps to provide a safe water system to the consumer personnel at Camp Lejeune, including Plaintiff herein.

70.    At all times relevant, agents, servants, and/or employees of Defendant, acting within the course and scope of their employment, fraudulently caused or permitted large quantities of contaminants to be leach into the aquifers, without providing notice or warnings to consumers that they were being exposed to the dangerous and/or potentially poisonous

substances and the source of said contaminants, that Defendant knew or should have known were leeching into the aforementioned water supply system.

71.    At all times relevant, Defendant knew or should have known that the leakage was causing the water to be contaminated and would likely cause a variety of health problems, including but not limited to cancers, liver and kidney damage, autoimmune deficiencies, central nervous system disturbances in humans, disfigurement, pain, suffering and possibly death to the people to whom Defendant provided said water system.

72.    That Defendant, at all times pertinent, through the acts and omissions of their agents, servants and/or employees acting within the course and scope of its employment were fraudulent and willfully and wantonly negligent, and in violation of its standard of due care in at least the following ways:

a.     In failing to provide water that was fit for human contact and consumption;

b.     In dumping or permitting the dumping and disposal of large quantities of contaminants and pollutants on its property that would and did cause contamination of the water supply system;

c.    In failing to train personnel concerning practices of disposal of contaminants and pollutants and in monitoring and detecting the hazard;

d.    In failing to ensure that the subject water supply was obtained from the most desirable source feasible and in failing to make efforts to control contaminants or pollution at the source or, if not accomplished by natural means, to do so by treatment.

e.    In failing to make sure that no potential health hazard existed in said water supply, either from the location, design or construction of the system that could allow pollution from extraneous sources, even if the physiological effects were not known.

f.    In failing to provide well-trained and competent personnel whose qualifications are commensurate with the responsibility of conscientiously operating the said water system so that it did not contain pollutants or contaminants.

g.    In failing to conduct frequent surveys of the water, and whenever surveys or tests were made, failing to take steps to rectify the contamination and pollution that those tests revealed.

h.   In failing to monitor and warn the inhabitants and other exposed persons at Camp Lejeune of the exposure to the exceedingly high levels of contaminant and other potential damage of exposure to the water supply;

i.   In fraudulently continuing to not only warn and notify, but to instill a level of confidence in those persons exposed to these contaminants and pollution that there is no proven connection between their identifiable illnesses, disfigurements and deaths and the poisons that existed in the water supply;

j.   In that even after Defendant was specifically warned by its own agents and contractors that it was supplying contaminated or polluted water to the inhabitants of Camp Lejeune, it was fraudulent and willfully and wantonly negligent in failing to timely repair defective improvements to real property for years thereafter without notice or warning to the people exposed;

k.   In failing to properly clean the contaminated and polluted condition in a timely manner to prevent contamination of the aquifers and surrounding areas;

1.   In that in addition to violating the standard of due care, Defendant is negligent in violating applicable federal, state,

and/or military regulations, orders, procedures or standards intended for the safety, health and welfare of the people located at Camp Lejeune;

m.   In continuing to the present day to instill a doubt in the minds of its victims by maintaining, insinuating or implying that there was no problem existing or if there was, that there is no causal link between the exposure to these contaminants and pollutants and their health problems;

n.   In failing to inspect and maintain the premises, including its improvements to real property;

o.   In failing to make sure that no potential health hazard existed in said water supply from a defective improvement to real property, either from the location, design or construction of the system that could allow pollution to contaminate the ground water, even if physiological effects were unknown;

p.   In failing to monitor and warn the inhabitants and other exposed persons at Camp Lejeune of the exposure to exceedingly high levels of contaminants caused by defective improvements to real property and potential damage of exposure to the water supply;

q.      In failing to properly construct or inspect improvements to real property to ensure the proper materials are used;

r.      In failing to properly develop real property;

s.      In failing to properly perform or furnish the design, plans, specifications, surveying, supervision, testing or observation of construction, or construction of improvements to real property;

l.      In failing to properly construct improvements to real property;

m.      In failing to properly repair improvements to real property; and

n.      In wrongfully concealing such fraud, willful or wanton negligence with regard to real property;

### Plaintiff's Claims

73.     The decedent, Grace Levin Wright, was a dependent of Herman Owens, who served as a United States Marine until his honorable discharge in June of 1968, and she resided at Tarawa Terrace on Camp Lejeune from 1959 through 1961 and returned prior to 1968, during which time the water supplied to her for drinking and bathing by the Defendant was contaminated and polluted as described above.

74.     As a direct and proximate cause of the exposure to said pollutants and contaminants aboard Camp Lejeune, decedent developed multiple serious, life-threatening illnesses, including, but not limited to, Hodgkins

Case 1:11-md-02218-TWT   Document 130   Filed 02/18/16   Page 33 of 36

Lymphoma, congestive heart failure, kidney problems, colon cancer that has metastasized to her liver, auto-immune deficiency, and suffered multiple miscarriages. She continued to suffer from each of the above-listed health issues, which required high doses of narcotics to address the pain; immune system difficulties required her to take high doses of immunoglobulin and other medications to address these ongoing problems; and she suffered confusion and loss of memory as a result of continued, necessary chemotherapy.

75.    Plaintiff Grace Levin Wright was born on April 19, 1956. During the course of her illness, she suffered pain, fear and anxiety of a recurrence; she suffered a loss of mobility and enjoyment of life, loss of income and the ability to obtain gainful employment, and medical expenses, among other things.

76.    As a direct and proximate cause of the exposure to said pollutants and contaminants at Camp Lejeune, decedent died on January 30, 2012 due to colon cancer.

WHEREFORE: Plaintiff demands judgment against Defendant in an amount that will fully compensate decedent's heirs for all the losses suffered, including the death of decedent, as allowed by the applicable law

and for costs, fees and other further relief that the Court may deem just and proper.

Respectfully submitted this 3rd day of February 2016.

/s/ J. Edward Bell, III
**BELL LEGAL GROUP, LLC**
J. Edward Bell, III
SC Bar # 631
ebell@edbelllaw.com
219 Ridge Street
Georgetown, SC 29440
(843) 546-2408
Fax (843) 546-9604
ATTORNEY FOR PLAINTIFF

## CERTIFICATE OF COUNSEL

Pursuant to Local Rule 5.1 of the Northern District of Georgia and Local Rule 7.1 Northern District of Georgia, the undersigned hereby certifies that the foregoing AMENDED COMPLAINT has been prepared in accordance with the prescribed format and that he has used 14 point Times New Roman as the font in this document.

SO CERTIFIED, this 18th day of February 2016.

/s/ J. Edward Bell, III
J. Edward Bell, III
Bell Legal Group
219 N. Ridge St.
Georgetown, SC 29440
(T) 843-546-2408
(F) 843-546-9604
ebell@edbelllaw.com

Attorney for Plaintiff

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| **Grace Levin Wright** | ) **Civil Action No.** |
| **Plaintiff,** | ) **1:11-md-002218-TWT** |
| | ) |
| | ) |
| **v.** | ) |
| | ) |
| | ) |
| **UNITED STATES OF AMERICA,** | ) |
| **Defendant.** | ) |

-------------------------------------------------

### CERTIFICATE OF SERVICE

I hereby certify that on February 18, 2016, I electronically filed a true and correct copy of PLAINTIFF GRACE WRIGHT'S AMENDED COMPLAINT using the Court's CM/ECF system, and a copy thereof was served on opposing counsel and other counsel for Plaintiffs registered in the Court's electronic case filing system.

SO CERTIFIED this 18th day of February 2016.

/s/ J. Edward Bell, III
J. Edward Bell, III
Bell Legal Group
219 N. Ridge St.
Georgetown, SC 29440
(T) 843-546-2408
(F) 843-546-9604
ebell@edbelllaw.com

Attorney for Plaintiff