**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

|  |  |  |
|---|---|---|
|  | : |  |
|  | : |  |
| IN RE CAMP LEJEUNE NORTH | : | MULTIDISTRICT LITIGATION |
| CAROLINA WATER | : | NO. 1:11-MD-2218-TWT |
| CONTAMINATION LITIGATION | : |  |

## OPINION AND ORDER

This matter is before the Court on the Government's motion for order relating to the preservation of documents and electronically stored information [37]; the Government's motion to dismiss [61]; the Government's motion to dismiss for lack of subject-matter jurisdiction [62]; the Plaintiffs' motion for oral argument [72]; Plaintiff Bryant's motion to amend complaint [77]; the Plaintiffs' motion for extension of time to complete discovery and to stay [83]; Plaintiff Johnston's pro se motion to amend [97]; Plaintiff Douse's pro se motion for reconsideration [117]; Plaintiff Straw's pro se motion for clerk's entry of default [121]; Plaintiff Douse's pro se motion to amend [123]; Plaintiff Wright's motion to amend complaint [126]; the Government's motion to dismiss all cases based on North Carolina statute of repose [127]; Plaintiff Douse's pro se motion for punitive and exemplary damages [143]; the Government's motion to strike [152]; Plaintiff Douse's pro se motion for additional award of damages, for relief based on Bivens, and for a protective order [156]; Plaintiff Bryant's supplemental motion to amend [164]; Plaintiff Straw's pro

se motion for permanent injunction [165]; Plaintiff Straw's <u>pro</u> <u>se</u> fourth motion for clerk's entry of default [169]; the Government's motion for protective order [172]; the Plaintiffs' motion to transfer pursuant to 28 U.S.C. § 1631 or motion for conditional suggestion of remand [176]; Plaintiff Straw's <u>pro</u> <u>se</u> first motion for clerk's entry of default [178]; the Plaintiffs' motion for a hearing [188]; and Plaintiff Straw's <u>pro</u> <u>se</u> motion for refund and further relief [192].

## I.    Procedural History

In this Multidistrict Litigation (MDL), the Plaintiffs are service members and/or their family members who allege they were exposed to toxic substances in the water supply while living at Marine Corps Base Camp Lejeune in North Carolina. The Plaintiffs further contend that the United States failed to monitor the quality of the water supply at Camp Lejeune and failed to provide notice to the Plaintiffs concerning the presence of toxic substances in the water supply.  The Plaintiffs allege that they have suffered illnesses or death as a result of the actions of the United States and bring their actions pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671-2680.  There are currently seventeen cases in the MDL and, although the potential number of plaintiffs is not known, there are currently over 4,000 claimants in the administrative process with the Department of the Navy.

Given the amount of time that has passed since it has addressed substantive matters, the court finds it useful to give a summary of the course of the litigation to this point. When the Multidistrict Litigation was formed, the court held a scheduling conference. After hearing from the parties, the court determined that the most efficient course of action would be to first address two threshold legal questions: (1) whether the limitations period contained in the Comprehensive Environmental Response Compensation and Liability ("CERCLA") preempted the North Carolina statute of repose; and (2) whether the North Carolina statute of repose had an exception for latent diseases.[1] Answering these two questions has taken the better part of five years.

Because the court determined that threshold legal issues needed to be addressed first, the court did not call for the filing of an omnibus complaint.[2] But the court did permit discovery on the <u>Feres</u> doctrine and the Federal Tort Claims Act discretionary

---

[1]    <u>See</u> Doc. No. [11], Transcript, April 19, 2011.

[2]    <u>See</u> Doc. No. [24] (court noted that "allowing for consolidated motions (and responses) applying these legal arguments to all current Plaintiffs in this MDL will afford the parties an opportunity to effectively brief these issues without duplication and will afford the court an opportunity to issue clear rulings on each legal argument that can guide the future of this MDL").

function exception.[3]  The parties had briefed motions to dismiss based on these two theories.[4]  Those motions are still pending.

In an order dated September 29, 2011, the court held that although a plain reading of 42 U.S.C. § 9658 of CERCLA might counsel a different result, based on the purpose of CERCLA as a remedial statute, section 9658 preempted both statutes of limitation and statutes of repose.[5]  Therefore, the court found that the applicable North Carolina statute of repose contained in North Carolina General Statute § 1-52(16) barred claims from accruing more than ten years from the last act giving rise to the cause of action would not apply to the Plaintiffs.  A consequence of this holding was that the court did not then need to consider whether North Carolina's statute of repose contained an exception for latent disease.  However, the Government then asked the court to rule on this alternative ground so that the parties could take an interlocutory appeal to the United States Court of Appeals for the Eleventh Circuit on both legal rulings.  The court agreed to do so and permitted the parties to brief the

---

[3]  See Doc. No. [24] (directing 60 day period of discovery on FTCA's discretionary function exception and Feres doctrine and staying discovery as to all other matters).

[4]  See Doc. Nos. [61] and [62].

[5]  See Doc. No. [13].

matter of a latent disease exception.[6]  In an order dated May 11, 2012, the court held that the statute of repose in North Carolina General Statute § 1-52(16) did not contain an exception for latent diseases.[7]

The Government then filed a motion for permission to file an interlocutory appeal pursuant to 28 U.S.C. § 1292(b).[8]  The court granted that motion.[9]  The Court of Appeals accepted the appeal on October 31, 2012,[10] which was docketed as <u>Bryant v. United States</u>, and held oral argument in the case on January 17, 2014.  However, just days prior to the argument, the United States Supreme Court granted <u>certiorari</u> in <u>CTS Corp. v. Waldburger</u>, No. 13-339, which would be directly controlling authority on the issue of CERCLA preemption.  The Court of Appeals held its ruling to await the Supreme Court's opinion in <u>Waldburger</u>.

On June 9, 2014, the Supreme Court held that CERCLA section 9658 did not preempt North Carolina's statute of repose.[11]  The Eleventh Circuit then took up the

---

[6]  <u>See</u> Doc. No. [49].

[7]  <u>See</u> Doc. No. [68].

[8]  <u>See</u> Doc. No. [81].

[9]  <u>See</u> Doc. No. [87].

[10]  <u>See</u> Doc. No. [89].

[11]  <u>See</u> <u>CTS Corp. v. Waldburger</u>, ___ U.S. ___, 134 S. Ct. 2175 (2014).

parties' appeal.  In its opinion, the Court of Appeals recognized the Supreme Court's holding in <u>Waldburger</u> as answering the first question and therefore turned to the second question – whether the North Carolina statute of repose includes an exception for latent disease.[12]  Based on the statute as it existed when the Plaintiffs brought their cases, the Court of Appeals found that the statutory language was unambiguous and did not contain an exception for latent disease.[13]

The Eleventh Circuit recognized, however, that shortly after the Supreme Court issued its decision in <u>Waldburger</u>, the North Carolina legislature amended the statute of repose to add the following language: "The 10-year period set forth in G.S. 1-52(16) shall not be construed to bar an action for personal injury, or property damages caused or contributed to by . . . the consumption, exposure, or use of water supplied from groundwater contaminated by a hazardous substance, pollutant, or contaminant."[14] The General Assembly specified that this amendment applied to any actions "filed, arising, or pending" on or after June 20, 2014.[15]  Nevertheless, the Court of Appeals found that the amendment should not apply retroactively because

---

[12]     See <u>Bryant v. United States</u>, 768 F.3d 1378 (11th Cir. 2014).

[13]     <u>Id.</u> at 1381.

[14]     <u>Id.</u> at 1381-82 (quoting N.C. Gen. Stat. Ann. § 130A-26.3).

[15]     <u>Id.</u> at 1382.

6

it "substantively amended the statute of repose to create an exception for groundwater contamination and, as a result, can only apply prospectively, lest [the amendment] divest the Government of a vested right."[16] The Court of Appeals then remanded the case.

This court accepted the order as mandate and held a Scheduling Conference on February 25, 2015, during which the Plaintiffs indicated they intended to seek certiorari as to the Eleventh Circuit's ruling in Bryant.[17]  The Supreme Court denied the Plaintiffs' petition for writ of certiorari.[18]  The court held another Scheduling Conference on January 6, 2016.  During that conference, the court directed the Government to file a motion to dismiss based on the Eleventh Circuit's holding in Bryant.[19]  In addition to responding to the Government's motion, the Plaintiffs have filed numerous motions to amend their complaints, as well as a motion to transfer or remand the Multidistrict Litigation.

---

[16]     Id. at 1385.

[17]     See Doc. Nos. [106] and [109].

[18]     See 136 S. Ct. 71 (2015).

[19]     See Doc. No. [124].

7

## II.      Discussion

### A.      Motion to Transfer or Remand

#### 1.      Impact of Stahle and Choice of Law Questions

In their motion to transfer, the Plaintiffs essentially ask that the court reconsider the outcome of Bryant in light of the Fourth Circuit's recent ruling in Stahle v. CTS Corporation.[20] The Plaintiffs' arguments are premised on a contention that the Fourth Circuit's holding in Stahle is in conflict with the Eleventh Circuit's ruling in Bryant.  In Stahle, the plaintiff filed a negligence action alleging that his leukemia was caused by his exposure to toxic solvents when he was a child.  The Fourth Circuit considered the scope of North Carolina General Statute § 1-52(16) in relation to Stahle's claim.  The Stahle court first recalled that the Fourth Circuit previously held in Hyer v. Pittsburgh Corning Corp., that "the [North Carolina] Supreme Court does not consider disease to be included within a statute of repose directed at personal injury claims."[21] Although the Stahle court agreed that section 1-52(16) "functions as a statute of repose directed at certain personal injury claims," it found that the "North Carolina General Assembly has not expressly expanded the

---

[20]      817 F.3d 96 (4th Cir. 2016).

[21]      Id. at 100 (citing Hyer, 790 F.2d 30, 34 (4th Cir. 1986).

language to include disease."[22] Thus, the court found that section 1-52(16) does not

apply to claims arising out of disease.[23] The court rejected CTS's argument that <u>Hyer</u>

addressed a different statute of repose.[24] Instead, the court ruled that "we anticipate

that the Supreme Court of North Carolina would rule that Section 1-52(16) is not

applicable to Stahle's claim arising from disease."[25] The <u>Stahle</u> court then went on

to discuss its disagreement with the Eleventh Circuit's ruling in <u>Bryant</u> that the plain

language of section 1-52(16) demonstrated that there was no exception for latent

diseases.[26]

---

[22]    <u>Id.</u>

[23]    <u>Id.</u>

[24]    <u>Id.</u> at 100-01 (citing <u>Hyer</u> and <u>Wilder v. Amatex Corp.</u>, 314 N.C. 550, 336 S.E.2d 66 (1985)).  Although the Eleventh Circuit did not discuss <u>Hyer</u> or <u>Wilder</u> in <u>Bryant</u>, this court did address both of those cases in its determination that section 1-52(16) did not contain an exception for latent diseases.  <u>See</u> Doc. No. [68], at 9-14. The court specifically rejected an argument that the analysis of the North Carolina Supreme Court in <u>Wilder</u> directly applies here because the statute of repose discussed in <u>Wilder</u> is materially different than that considered in this case.  <u>Id.</u>  The court also noted that no North Carolina case had cited <u>Hyer</u>, but rather it had been cited only by other Fourth Circuit cases.  <u>Id.</u>  In <u>Bryant</u>, without a discussion of <u>Hyer</u> and <u>Wilder</u>, the Eleventh Circuit outright rejected the interpretation proffered by <u>Stahle</u>, finding that it ignored the plain language of the statute.  <u>See Bryant</u>, 768 F.3d at 1381.

[25]    817 F.3d at 104.

[26]    <u>Id.</u> at 104-07.

There can be no dispute that under the "law of the case" doctrine, the court must apply the Eleventh Circuit's ruling in Bryant.[27] There are only three exceptions to this doctrine: (1) discovery of new evidence, (2) controlling authority that renders Bryant contradictory, and (3) the ruling is clearly erroneous and would work manifest injustice. None of these exceptions is present here. In candor, the court is troubled by the argument raised by the Plaintiffs' Liaison Counsel that this court "certainly does not owe blind deference to the erroneous 11th Circuit Bryant opinion."[28] The Plaintiffs rely upon a quote from Rutherford v. Columbia Gas that "some courts have recognized that the obligation to properly determine state law is more important than the general dictate to defer to prior federal precedent construing state law."[29] The Plaintiffs' quote does not come from the majority opinion in Rutherford. Rather, it comes from the concurring and dissenting opinion.[30] Moreover, Rutherford involved whether a panel of the Sixth Circuit was bound to follow a prior Sixth Circuit panel's interpretation of Ohio law when that interpretation was based on an opinion of a

---

[27]   See, e.g., Venn v. St. Paul Fire & Marine Ins. Co., 99 F.3d 1058, 1063 (11th Cir 1996) ("Under the law of the case doctrine, both the district court and the appellate court are generally bound by a prior appellate decision of the same case.").

[28]   See Doc. No. [160], at 15-16.

[29]   575 F.3d 616 (6th Cir. 2009).

[30]   Id. at 624 (Clay, J., concurring in part and dissenting in part).

lower Ohio court.  The discussion in <u>Rutherford</u> was not whether a district court had to follow the precedent of its own circuit court of appeals in the same case.  On this matter, there really can be no dispute.  Obviously, this court's circumstances are vastly different.   There can be no dispute that as a district court, this court must follow <u>Bryant</u>.

Similarly irrelevant for this court is whether any one federal court of appeals must follow another federal court of appeals' view of state law.  Yet, the Plaintiffs cite to <u>Factors Etc., Inc. v. Pro Arts, Inc.</u>,[31] as if it provides some authority for this court to disregard <u>Bryant</u> when <u>Factors</u> really discusses whether the Second Circuit should follow the Sixth Circuit's interpretation of a matter of state law.  It is axiomatic that the Second Circuit is not controlled by the Sixth Circuit.

Finally, the Plaintiffs expend a great deal of energy arguing why the Eleventh Circuit was incorrect in its interpretation of North Carolina law and should have reached the same outcome as <u>Stahle</u>.[32]  Again, as a district court, this court is bound to follow <u>Bryant</u>.  This court has no authority or desire to reconsider an opinion of the Eleventh Circuit.  Moreover, simply because the Fourth Circuit sits in North Carolina does not render it as the final authoritative word on the interpretation of North

---

[31]     652 F.2d 278, 283 (2d Cir. 1981).

[32]     <u>See</u> Doc. No. [160], at 16-22.

11

Carolina law.  The Fourth Circuit – like all federal courts across the country – is charged with making an Erie prediction as to what the highest court of North Carolina would say about North Carolina state law.[33]  Regardless of whether as a practical matter, the Fourth Circuit might have more experience in interpreting North Carolina law, there is nothing "binding" about the Fourth Circuit's decision in Stahle as to other federal courts of appeal, or even as to North Carolina state courts, of course.

Moreover, the court notes that the decision in Stahle, itself, is a cogent reminder of the fact that North Carolina law remains highly unsettled in this area.  In her concurring opinion, Judge Thacker noted two factors that this court had previously relied upon in finding that section 1-52(16) does not contain an exception for latent diseases: (1) Hyer can only be considered dicta because it construed a materially different statute than section 1-52(16); and (2) Hyer has not been cited by a reported North Carolina decision.[34]  Judge Thacker went even further in discussing the muddied waters of North Carolina law in this area in noting that the North Carolina Supreme Court as well as now four different federal circuits have reached

---

[33]    See, e.g., Molinos Valle Del Cibao C. por A. v. Lama, 633 F.3d 1330, 1348 (11th Cir. 2011) (citing Guideone Elite Ins. Co. v. Old Cutler Presbyterian Church, Inc., 420 F.3d 1317, 1326 n.5 (11th Cir. 2005)).

[34]    See Stahle, 817 F.3d at 111-12 (Thacker, J., concurring).

12

conflicting conclusions on the question of whether "personal injury" in North Carolina encompasses a claim for "disease."  She stated:

> The Supreme Court of North Carolina itself has sent mixed signals about the scope of § 1–52(16). Compare Dunn v. Pac. Emp'rs Ins. Co., 332 N.C. 129, 418 S.E.2d 645, 647–48 (1992) (holding that, in an action based on the decedent's death from cancer based on exposure to hazardous chemicals, § 1–52(16) would be the proper statute of limitations for the underlying claim for bodily injury), and Wilder, 336 S.E.2d at 69 (suggesting that "the statute of limitations contained in the first clause of G.S. 1–52(16)" "govern[s] all negligence claims"), with Boudreau v. Baughman, 322 N.C. 331, 368 S.E.2d 849, 853 n. 2 (1988) (suggesting that § 1–52(16) was "intended to apply to plaintiffs with latent injuries," and is "inapplicable" to claimants who are "aware of [their] injury as soon as it occur[s]"), and Misenheimer [v. Burris], 637 S.E.2d [173], 175–76[, 360 N.C. 620 (2006)] (explaining that latent injury claims remain subject to the statute of repose in § 1–52(16)); see also Ante at 109-10.

> And outside of North Carolina's borders, after the publication of this decision, four circuits will have addressed this state law question, all with different views of the statute's scope. Compare In re Dow Corning Corp., 778 F.3d 545, 552 (6th Cir. 2015) ("The Fourth Circuit has consistently applied th[e] 'disease exception,' first announced by the North Carolina Supreme Court in Wilder v. Amatex, to diseases incurred from exposure to harmful products"), and Bryant v. United States, 768 F.3d 1378, 1381 (11th Cir. 2014) (holding that the statute of repose in § 1–52(16) unambiguously applies to disease claims), and Klein v. DePuy, Inc., 506 F.3d 553, 559 (7th Cir. 2007) (in holding that "§ 1–52(16) is not limited to latent injury claims," relying on Dunn and Wilder, rejecting Hyer, and ignoring Misenheimer).[35]

---

[35]     Id. at 114.

13

For this court, of course, the Eleventh Circuit's ruling in <u>Bryant</u> is binding.[36]

In addition, the Plaintiffs argue that <u>Stahle</u> is now binding authority on North Carolina law and for this reason, the court must reconsider its prior ruling and should apply <u>Stahle</u> and not <u>Bryant</u>.   There are numerous reasons why the Plaintiffs' argument is an incorrect statement of the law.  The Plaintiffs first argue that because most of the underlying cases were filed in North Carolina, the court must apply North Carolina law under the "transferee/transferor" theory.  As to the Plaintiffs from other states, the Plaintiffs contend that the court would have to undertake a choice of law analysis based on the individual facts and causes of action pleaded in each of those complaints.

Before addressing the Plaintiffs' arguments concerning whether this court is bound to apply the law of the transferor forum, the court finds it useful to delve at some depth into the basis for this court's jurisdiction.  As the Government points out, these cases have been brought under the Federal Tort Claims Act and as such, the basis for jurisdiction is not diversity, but rather original federal question jurisdiction

---

[36]   The Plaintiffs also contend that § 1-52(16) does not apply to any causes of action that are not based on North Carolina law.  Some of the Plaintiffs have raised wrongful death, intentional infliction of emotional distress, and post-discharge failure to warn claims.  To the extent such claims exist under state law other than North Carolina and are not barred by the North Carolina statute of repose, the court addresses them below in conjunction with the discretionary function exception under the Federal Tort Claims Act.

14

under the Federal Tort Claims Act.[37]   Much of the argument made by the Plaintiffs is based on their incorrect assumption that this is a diversity action.  For example, the Plaintiffs are correct that in a diversity action, the MDL court must apply the law of the transferor forum, that is, the law of the state in which the action was filed, including the transferor forum's choice-of-law rules.[38]   In diversity actions, the transferee-transferor considerations can be quite complex.[39]   But the court need not reach these issues because this is not a diversity case.

When an MDL court (the "transferee" court) has a case with jurisdiction based on federal law, it does not apply the law of the transferor court as it would under Van Dusen/Ferens, rather the transferee court should follow the law of its own circuit on

---

[37]     See, e.g., James Ventures, L.P. ex rel. Alpert v. Timco Aviation Servs., Inc., 315 F. App'x 885, 888 (11th Cir. 2009).

[38]     See, e.g., Ferens v. John Deere Co., 494 U.S. 516, 524 (1990); Van Dusen v. Barrack, 376 U.S. 612 (1964).

[39]     See, e.g., Wahl v. General Electric Co., 786 F.3d 491 (6th Cir. 2015) (discussing application of Van Dusen/Ferens in Multidistrict Litigation in conjunction with distinctions between § 1404 and § 1406).

15

questions of federal law.[40] "As a general rule, questions of federal law in MDL-transferred cases are governed by the law of the transferee circuit."[41]

The court must now consider under Eleventh Circuit authority which law to apply to the Plaintiffs' federal cause of action under the Federal Tort Claims Act. "It is well settled that the United States, as a sovereign entity, is immune from suit unless it consents to be sued."[42] "Through the enactment of the FTCA, the federal government has, as a general matter, waived its immunity from tort suits based on state law tort claims."[43]

The <u>Zelaya</u> court also explained that:

---

[40]    <u>See</u>, <u>e.g.</u>, <u>In re Korean Air Lines Disaster of September 1, 1983</u>, 829 F.2d 1171 (D.C. Cir. 1987), <u>aff'd</u> <u>on</u> <u>other</u> <u>grounds</u> <u>sub</u> <u>nom.</u> <u>Chan v. Korean Air Lines, Ltd.</u>, 490 U.S. 122 (1989); <u>U.S. ex rel. Hockett v. Columbia/HCA Healthcare Corp.</u>, 498 F. Supp. 2d 25, 39-40 (D.D.C. 2007).

[41]    <u>Hockett</u>, 498 F. Supp. 2d at 40. The Plaintiffs' citation to <u>In re Dow Corning Corp. (Sutherland v. DCC Litig. Facility)</u>, 778 F.3d 545 (6th Cir. 2015), does not counsel a different result. In <u>Sutherland</u>, the plaintiff had filed a diversity personal injury case against the defendant. When the defendant entered into bankruptcy, the federal district court transferred the personal injury case to the court overseeing the defendant's bankruptcy proceedings. <u>Id.</u> at 549. The Sixth Circuit recognized that although this was "not quite a diversity case," the court should still apply the state law of the transferor court in which the personal injury case was originally filed. <u>Id.</u> at 549-51. These are not the circumstances of this case.

[42]    <u>Zelaya v. United States</u>, 781 F.3d 1315, 1321 (11th Cir. 2015).

[43]    <u>Id.</u> (citing <u>Millbrook v. United States</u>, ___ U.S. ___, 133 S. Ct. 1441, 1443 (2013)).

AO 72A
(Rev.8/82)

Any plaintiff seeking to sue the United States under the FTCA must satisfy two initial statutory burdens to establish jurisdiction. <u>Clark v. United States</u>, 326 F.3d 911, 912 (7th Cir. 2003). First, as with all suitors in federal courts, the plaintiff must identify an explicit statutory grant of subject matter jurisdiction, which in the case of the FTCA is 28 U.S.C. § 1346(b)(1). <u>Id.</u> This statute provides:

> Subject to the provisions of chapter 171 of this title [i.e., 28 U.S.C. §§ 2671–2680], the district courts . . . shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1) (emphasis added). Translated, any time the federal government is sued based on the act of an employee performed within the scope of his employment duties, federal district courts will have exclusive jurisdiction of such claims. In addition, § 1346(b)(1) sets, as a predicate, a requirement that the circumstances be such that a private person would be liable under the law of the state where the federal employee's act or omission occurred, had a private person so acted.[44]

The "reference in § 1346(b)(1) to 'the law of the place where the act or omission occurred' means the law of the state where the alleged tort occurred."[45] "Because the

---

[44]     <u>Id.</u>

[45]     <u>Id.</u> at 1323 (citing <u>Stone v. United States</u>, 373 F.3d 1129, 1130 (11th Cir. 2004)).

17

United States is a sovereign entity, the second jurisdictional requirement is a statute that waives its sovereign immunity."[46]  The court discusses this second requirement in more detail below when addressing the discretionary function exception.

The "law of the place where the act or omission occurred" means "the whole law of the State where the act or omission occurred," including the choice of law rules of that state.[47]  "The plaintiff's injury is considered to be sustained in the state 'where the last act occurred giving rise to [the] injury.'"[48]  Here, there can be no dispute but that the place is North Carolina, the state in which all of the Plaintiffs resided at the time they allege they were exposed to a contaminated water supply at Camp Lejeune.  All actions with respect to the water supply at Camp Lejeune took place in North Carolina.  North Carolina applies the traditional lex loci delicti rule in tort cases.[49]  Significantly, under North Carolina law, a statute of repose is considered

---

[46]    Id. at 1322.

[47]    See Richards v. United States, 369 U.S. 1, 11 (1962); Schippers v. United States, 715 F.3d 879, 886 (11th Cir. 2013).

[48]    Harco, 206 N.C. App. at 694, 698 S.E.2d at 724.

[49]    See, e.g., Boudreau v. Baughman, 322 N.C. 331, 335, 368 S.E.2d 849, 853-54 (1988); Harco Nat'l Ins. Co. v. Grant Thornton LLP, 206 N.C. App. 687, 692, 698 S.E.2d 719 (2010).

18

substantive law and therefore is also part of the "law of the place" of North Carolina.[50]

While the FTCA does direct that North Carolina law applies as the "law of the place where the act or omission occurred," the fact that federal law points to state law for its choice of law does not mean that the cause of action arises under state law. This is not a distinction without a difference, as this very case shows. There is only one federal law.  The court applies the federal law as located in its controlling precedent – in this case, Bryant.  The court does not ignore the fact that – as it turns out – the Eleventh Circuit and the Fourth Circuit have reached different conclusions as to the interpretation of North Carolina law to be applied to this federal question under the FTCA.  But that simply happens to be a product of the fact that there are different federal courts of appeal in the United States.  A plaintiff has no "right" to the Fourth Circuit's interpretation of North Carolina law over the Eleventh Circuit's interpretation.  Once the determination was made to put these cases into an MDL assigned to the United States District Court for the Northern District of Georgia, that choice was fixed as to the Eleventh Circuit's interpretation.

---

[50]     See, e.g., Christie v. Hartley Constr., Inc., 367 N.C. 534, 766 S.E.2d 283 (2014); Boudreau, 322 N.C. at 341, 368 S.E.2d at 857 ("If the action is not brought within the specified period, the plaintiff 'literally has no cause of action.  The harm that has been done is damnum absque injuria – a wrong for which the law affords no redress.'" (citation omitted)).

AO 72A
(Rev.8/82)

Perhaps understanding that this court has no choice but to follow <u>Bryant</u>, the Plaintiffs make several suggestions as to procedural options the court could exercise as a means of avoiding the outcome dictated by <u>Bryant</u>.  First, the Plaintiffs recommend that the court "remand" this case.  Second, the Plaintiffs suggest that if the court finds there is no subject-matter jurisdiction, it should "transfer" the cases back to the United States District Court for the Eastern District of North Carolina.[51]  For the reasons explained below, neither of these procedural options is available to the court.

The court begins by noting the procedure under which these cases were transferred to the Northern District of Georgia.  Pursuant to 28 U.S.C. § 1407, the United States Judicial Panel on Multidistrict Litigation may transfer "civil actions involving one or more common questions of fact [] pending in different districts . . . to any district for coordinated or consolidated pretrial proceedings."[52]  "Each action so transferred shall be remanded by the panel at or before the conclusion of such proceedings to the district from which it was transferred unless it shall have been previously terminated."[53]  Here, the Judicial Panel found under section 1407 that all

---

[51]   <u>See</u> Doc. No. [176].

[52]   28 U.S.C. § 1407.

[53]   <u>Id.</u>

20

actions shared "factual questions arising out of alleged death or injuries due to contaminated drinking water on the Marine Corps Base at Camp Lejeune" and should be centralized.[54]

The Plaintiffs contend that when jurisdiction is lacking, remand under 28 U.S.C. § 1631 to the Court of Appeals that does have jurisdiction is the proper course of action. The court cannot agree. Title 28 U.S.C. § 1631 provides:

> Whenever a civil action is filed in a court as defined in section 610 of this title or an appeal, including a petition for review of administrative action, is noticed for or filed with such a court and that court finds that there is a want of jurisdiction, the court shall, if it is in the interest of justice, transfer such action or appeal to any other such court in which the action or appeal could have been brought at the time it was filed or noticed, and the action or appeal shall proceed as if it had been filed in or noticed for the court to which it is transferred on the date upon which it was actually filed in or noticed for the court from which it is transferred.[55]

Courts have applied section 1631 where a plaintiff files a case "in the wrong court for very understandable reasons" and requiring re-filing in the right court might raise statute of limitations issue.[56] That is not the situation facing the Plaintiffs here. For the claims barred by North Carolina's statute of repose, there is no "right court" in

---

[54] See Doc. No. [1], Transfer Order.

[55] 28 U.S.C. § 1631.

[56] See, e.g., ITT Base Servs. v. Hickson, 155 F.3d 1272, 1276 (11th Cir. 1998).

21

which the claims could be filed.  Those claims have been extinguished by operation of North Carolina substantive law.[57]

Most significantly, the Plaintiffs offer no response to the Government's argument that any remand or transfer is barred by <u>Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach</u>.[58]  In <u>Lexecon</u>, Lexecon was one of several defendants in a Multidistrict Litigation case concerning economic losses resulting from the failure of the Lincoln Savings & Loan.  While the MDL proceeded on pretrial issues, the plaintiffs and Lexecon reached a settlement.  Lexecon then filed a state law action against class counsel for the plaintiffs.  That case was also transferred into the Multidistrict Litigation.  After the remaining parties in the litigation reached a settlement, Lexecon asked for its case against class counsel to be "remanded," but class counsel asked for the case to be "transferred" under 28 U.S.C. § 1404 to the same court having presided over the pretrial proceedings in the MDL.

The Supreme Court held that the MDL court had no authority to "transfer" any individual case under section 1404.  The Court began with the language of section

---

[57]    To the extent the court reaches below an alternative ruling that the Plaintiffs' claims are also barred by the discretionary function exception to the FTCA, that holding arises out of issues related to sovereign immunity and that is also not an issue that can be "corrected" by remand or transfer to a different court.

[58]    523 U.S. 26 (1998).

1407(a) which authorizes the Judicial Panel on Multidistrict Litigation to transfer civil actions with common issues of fact "to any district for coordinated or consolidated pretrial proceedings," but imposes a duty on the Judicial Panel to remand any such action to the original district "at or before the conclusion of such pretrial proceedings."[59]  But the Court also noted the language of the Judicial Panel's Rule 14(b) which provides that "[e]ach transferred action that has not been terminated in the transferee district court shall be remanded by the Panel to the transferor district for trial, unless ordered transferred by the transferee judge to the transferee or other district under 28 U.S.C. § 1404(a) or 28 U.S.C. § 1406."[60]  Further, the Court noted that the language of § 1407(a), itself, applied only to pretrial proceedings and did not specifically bar a "self-transfer."[61]

Ultimately, however, the Court found that "textual pointers" lead to the opposite conclusion that there could not be such a "transfer" because of the mandatory "shall" preceding the direction to remand the cases at the conclusion of pretrial proceedings.[62]  "In the absence of any indication that there might be

---

[59]  Id.

[60]  Id. at 33.

[61]  Id. at 33-34.

[62]  Id. at 35.

23

circumstances in which a transferred case would be neither 'terminated' nor subject to the remand obligation, then, the statutory instruction stands flatly at odds with reading the phrase 'coordinated or consolidated pretrial proceedings' so broadly as to reach its literal limits, allowing a transferee court's self-assignment to trump the provision imposing the Panel's remand duty."[63]  The Court continued: "Section 1407(a) speaks not in terms of imbuing transferred actions with some new and distinctive venue character, but simply in terms of 'civil actions' or 'actions.' It says that such an action, not its acquired personality, must be terminated before the Panel is excused from ordering remand."[64] Thus, the Court found that Rule 14(b) was inconsistent with the statutory language of section 1407(a).[65]  The Supreme Court viewed section 1407 not as a jurisdictional statute, but rather as a "venue statute that . . . categorically limits the authority of courts (and special panels) to override a plaintiff's choice [of forum]."[66]  Accordingly, an MDL transferee court cannot order a transfer of a case from the MDL back to itself or to any other district court directly.

---

[63]     Id.

[64]     Id. at 37.

[65]     Id. at 40.

[66]     Id. at 42.

AO 72A
(Rev.8/82)

Lexecon's bar has been interpreted broadly.[67]  At least two other courts have held that Lexecon's bar on transfer under section 1404 extends to transfer under section 1631 to correct some jurisdictional defect.[68]  It is true that this court as the transferee court may "suggest" to the Judicial Panel that it should remand the case.[69] But for all of the reasons given in this order, the court does not find any compelling reason to make such a suggestion.

The Plaintiffs also argue that the issue is one of "venue" because the Fourth Circuit would permit these cases to proceed based on its interpretation of North Carolina law, and the Eleventh Circuit will not.  The court again does not agree with this characterization.  Venue in this case is not "improper" as the term is used in

---

[67]     See In re Asbestos Prods. Liab. Litig. (No. VI), 965 F. Supp. 2d 612, 622 (E.D. Pa. 2013) ("It follows, therefore, that after an MDL transferee court has seen an MDL case through the pretrial phase, the MDL court can either rule on the dispute, or suggest to the JPML that it be remanded to the transferor court for trial. Succinctly put, Lexecon does not allow an MDL transferee court to transfer a case back to itself for trial; nor does Lexecon leave room for the MDL transferee court to transfer MDL cases to other districts directly.").

[68]     See In re Chiquita Brands Int'l, Inc. Alien Tort Statute & S'holder Derivative Litig., ____ F. Supp. 3d ____, 2016 WL 3247913 (S.D. Fla. June 1, 2016); In re FEMA Trailer Formaldehyde Prods. Liab. Litig., MDL No. 1873, 2012 WL 1580761 (E.D. La. May 4, 2012) (observing that under Lexecon district court could transfer directly-filed cases under § 1406(a) but likely not tagalong cases). Compare In re Western States Wholesale Natural Gas Antitrust Litig., MDL No. 1566, 2010 WL 2539728 (D. Nev. June 4, 2010) (cannot transfer MDL case under § 1631 unless party waives venue).

[69]     See Panel Rule 10.1(b).

25

section 1406(a).  The fact that the United States Court of Appeals for the Fourth Circuit has construed North Carolina law in a way that is more favorable to the Plaintiffs' position than the interpretation of North Carolina law offered by the United States Court of Appeals for the Eleventh Circuit does not mean that this court is an "improper" venue.

The Judicial Panel on Multidistrict Litigation determined that these cases should be transferred to the Northern District of Georgia and the Plaintiffs have offered no argument that this decision was procedurally flawed other than the fact that they had asked the Judicial Panel on Multidistrict Litigation to consolidate these cases for pretrial proceedings in the United States District Court for the Eastern District of North Carolina where several of the cases were pending.  The Judicial Panel, however, was under no obligation to follow that request.

The Plaintiffs also complain that Erica Bryant (the only plaintiff who filed in the Northern District of Georgia) had asked this court – prior to the formation of the MDL – to transfer the case to the Eastern District of North Carolina.  This court did not rule on that motion prior to the transfer of the MDL to the Northern District of Georgia and then denied the motion as moot once the MDL was transferred.  Again, there is nothing improper in the sequencing of these events.  But the Plaintiffs contend that the holding of <u>Bryant</u> will result in a "miscarriage of justice" because the

AO 72A
(Rev.8/82)

Eleventh Circuit's ruling on the statute of repose applies "simply because of where the Panel decided to transfer all of the cases, even in the face of Bryant's earlier request for transfer."[70]  However, these are the kinds of decisions that are made every day in MDL litigation and consolidation assignments.  It is not enough to argue that the decision turned out not to be favorable to the Plaintiffs and therefore is a "miscarriage of justice."  The Plaintiffs fail to substantiate in any way their argument that this outcome violates their Equal Protection and Due Process rights.[71]

This is different than a situation in which a plaintiff truly filed in the wrong venue or filed in a district court that lacked personal jurisdiction over a defendant. In those cases, the plaintiff might argue a potential miscarriage of justice.  Here, rather, the "jurisdictional" or "venue" argument raised by the Plaintiffs is actually an argument against the substantive ruling by the Bryant court that the claims have been extinguished as a matter of law by a statute of repose under North Carolina law – the law which would apply to the Plaintiffs' claims no matter where they are filed.  The Plaintiffs ask for remand or transfer here solely as a means of avoiding the outcome required by the Eleventh Circuit's ruling in Bryant.  Under these circumstances, the

---

[70]    See Doc. No. [176], at 12.

[71]    Id. at 13.

27

court finds that this is not a proper basis for remand or transfer, even if the court had the authority to do either.

Finally, the Plaintiffs argue that the Multidistrict Litigation is a "nullity" because the court did not establish a Steering Committee or direct the Plaintiffs to file an omnibus complaint. The court finds this argument to be totally without merit. As the court explained above, it made the determination to address the threshold legal issues in the case first because of the possibility that those legal matters could be outcome determinative. As it turns out, they were. The court understands the Plaintiffs' frustration that it took five years to reach a conclusion on these issues, but that is an unfortunate reality of litigation when arguments are raised to the level of the United States Supreme Court.

In finding that it is bound by <u>Bryant</u> and the North Carolina statute of repose bars the Plaintiffs' claims, the court is not indifferent to the assertions made by the Plaintiffs here. The Plaintiffs have raised serious allegations and contend they and their families have suffered very serious consequences as a result of the contamination of the water supply at Camp Lejeune. But the nature of the Plaintiffs' allegations cannot alter the court's obligation to follow the law.

2.      New Theories of Liability

Given the substantive outcome of the Eleventh Circuit and Supreme Court cases, in their most recent motions, the Plaintiffs have contended that the North Carolina statute of repose that has been at issue for the entirety of this litigation is not actually the statute of repose the court should apply.  While the Plaintiffs recognize that it would have been better for them to have raised this argument at the inception of this litigation five years ago, they say it is an issue of subject-matter jurisdiction which the court must address at any stage of the litigation.

The Plaintiffs now argue that the applicable North Carolina statute of repose is one related to real property.[72]  The Government responds that the real property

_____

[72]    Plaintiff Wright has filed a proposed amended complaint with allegations geared toward this new argument about the statute of repose, as well as the Government's arguments on the discretionary function exception to the FTCA discussed below.  Plaintiff Bryant has also filed several proposed amended complaints.  Despite the fact that the court has not granted leave to amend, the court considers the factual allegations raised by Plaintiffs Wright and Bryant in the interest of judicial economy.

Given that even considering the additional allegations in Plaintiff Wright's and Plaintiff Bryant's proposed amended complaints, the court determines that the Plaintiffs' claims are barred under North Carolina's statute of repose as well as the Feres doctrine and the discretionary function exception to the Federal Tort Claims Act, the court DENIES AS MOOT Plaintiff Bryant's motion to amend complaint [77]; DENIES AS MOOT Plaintiff Wright's motion to amend complaint [126] and DENIES AS MOOT Plaintiff Bryant's supplemental motion to amend [164].  Because the court denies these motions as moot, the court need not consider the Government's arguments that the Plaintiffs should not be permitted to amend their complaints for various procedural reasons or because they are dilatory and futile.  The court DENIES AS MOOT the Government's motion to strike [152].

statute of repose does not apply because the Plaintiffs' alleged injuries arise out of contamination of the water supply at Camp Lejeune and not any structural or architectural defect in the real property improvements.

In her proposed amended complaint addressing the real property statute of repose, Plaintiff Wright asserts that there are three sources of contamination of the Camp Lejeune water supply: (1) the dry cleaners at Tarawa Terrace, (2) leaking storage tanks at the Hadnot Point aquifer, and (3) surreptitious dumping of chemical contaminants from training exercises for firemen.  The Plaintiffs contend that the Tarawa Terrace and Hadnot Point contamination go to wells, underground piping and delivering systems, and water treatment plants that constitute "improvements to real property" and thus implicate North Carolina General Statute § 1-50(a)(5) which contains a shorter six year statute of repose than § 1-52(16).  Further, the Plaintiffs contend a defendant may not take advantage of the six year statute of repose under § 1-50(a)(5) if the property owner was in actual control or possession of the improvement and knew or should have known of the defective and unsafe conditions or the property owner engaged in willful or wanton negligence or concealment.[73]

---

[73]     Section 1-50(a)(5)(d) provides:
The limitation prescribed by this subdivision shall not be asserted as a defense by any person in actual possession or control, as owner, tenant or otherwise, of the improvement at the time the defective or unsafe condition constitutes the proximate cause of the injury or death for which it is

North Carolina General Statute § 1-50(a)(5) provides:

No action to recover damages based upon or arising out of the defective or unsafe condition of an improvement to real property shall be brought more than six years from the later of the specific last act or omission of the defendant giving rise to the cause of action or substantial completion of the improvement.[74]

In Wilson v. McLeod Oil Co.,[75] the North Carolina Supreme Court discussed § 1-50(a)(5) and the purpose of its statute of repose.  The Court explained that the:

exception found in this section is based on the continued duty of owners and tenants to inspect and maintain the premises. Gillespie v. Coffey, 86 N.C.App. 97, 356 S.E.2d 376 (1987). Furthermore, § 1–50(5) was not intended to limit the liability of persons in the Warrens' situation because it was "designed to limit the potential liability of architects, contractors, and perhaps others in the construction industry for improvements made to real property." Lamb v. Wedgewood South Corp., 308 N.C. 419, 427–28, 302 S.E.2d 868, 873 (1983) (interpreting similar language in an earlier version of the statute). This statute limits the liability for certain groups who might otherwise be subject to a longer statute of limitation. Id. at 427, 302 S.E.2d at 873. The exception in this statute indicates that the limited period of liability was not intended to apply to those in actual possession or control of the land if they knew or had reason to know of the defect.[76]

---

proposed to bring an action, in the event such person in actual possession or control either knew, or ought reasonably to have known, of the defective or unsafe condition.

See N.C. Gen. Stat. § 1-50(a)(5)(d).

[74]    N.C. Gen. Stat. § 1-50(a)(5).

[75]    327 N.C. 491, 398 S.E.2d 586 (1990).

[76]    Id. at 517, 398 S.E.2d at 600.

31

Later cases confirm the fact that § 1-50(a)(5) was meant to address the liability of architects, designers, and contractors.  For example, in Dawson v. North Carolina Department of Environment and Natural Resources,[77] the court considered the purpose of § 1-50(a)(5) and noted that:

> the plain language of the statute indicates that the statute does not apply unless the action "aris[es] out of the defective or unsafe condition of an improvement to real property." N.C. Gen. Stat. § 1–50(a)(5)(a). Indeed, our Supreme Court has held:
>
>> In order for this statute to apply, three circumstances must exist: (1) the action must be for recovery of damages to real or personal property, (2) the damages must arise out of the defective and unsafe condition of an improvement to real property, and (3) the party sued must have been involved in the designing, planning, or construction of the defective or unsafe improvement.
>
> Feibus & Co. v. Godley Constr. Co., 301 N.C. 294, 302, 271 S.E.2d 385, 391 (1980) (emphasis added).
>
> Similarly, in Trustees of Rowan Tech. Coll. v. J. Hyatt Hammond Assocs., 313 N.C. 230, 239, 328 S.E.2d 274, 280 (1985) (emphasis added), the Court held that N.C. Gen. Stat. § 1–50(a)(5) "deals with actions for damages for breach of contract, negligence, and recovery of economic or monetary loss in general arising from faulty repair or improvement to real property against, among others, persons who furnish the design for or supervise the construction of such repair or improvement. . . ." Phrased differently, the statute "deals expressly with claims arising out of defects in improvement to realty caused by the performance of specialized services of designers and builders." Id., 328 S.E.2d at 279–80 (emphasis added).

---

[77]    204 N.C. App. 524, 694 S.E.2d 427 (2010).

AO 72A
(Rev.8/82)

In sum, a prerequisite for application of N.C. Gen. Stat. § 1–50(a)(5) is that there must have been an improvement to real property and that improvement must be either defective or unsafe.[78]

Here, the Plaintiffs contend that the wells, underground piping and delivery systems, and water treatment plants constitute improvements to real property under § 1-50(a)(5). The Plaintiffs assert that the wells and water treatment plants were contaminated and therefore were unsafe or defective. Presuming that § 1-50(a)(5) is the appropriate statute of repose, the Plaintiffs then go on to state that the Government cannot take advantage of this statute of repose because it has remained the landowner of the property in question and was aware of the "improvements" regarding the water treatment system and engaged in "willful and wanton negligence."

Significantly, however, there is no contention that the design or construction of the water treatment plants or wells was defective such that it caused the contamination of the water. Rather, the Plaintiffs clearly assert that the Government

---

[78]    Id. at 529-30, 694 S.E.2d at 431 (footnote omitted); see also Forsyth Mem'l Hosp., Inc. v. Armstrong World Indus., Inc., 336 N.C. 438, 447, 444 S.E.2d 423, 429 (1994) (referring to § 1-50(a)(5) as "statute of repose governing actions against a materialman arising out of improvement to real property."); Trustees of Rowan Tech. Coll. v. J. Hyatt Hammond Assocs., 313 N.C. 230, 239, 328 S.E.2d 274, 280 (1985) ("Our decision is further bolstered by the fact that § 50(5) was enacted, like many similar statutes across the country, at the urging of architects and builders in order to protect them against claims arising long after their work had been accomplished.").

itself, or individuals permitted by the Government to be on the property, dumped chemicals into the ground such that the water table became contaminated.  It is the dumping and the failure to monitor water quality, the Plaintiffs contend, that caused the contamination, not any malfunction with the water treatment and delivery system. There is no contention that the water treatment system failed to operate as designed. Based on these allegations, the court finds that section 1-50(a)(5) does not apply because the issue here is not one of a "defective or unsafe condition of an improvement to real property." Thus, the statute of repose in § 1-52(16) does apply.[79]

 For all of the foregoing reasons, the court reaffirms that the ten-year North Carolina statute of repose in § 1-52(16) applies to the Plaintiffs' claims.  There appears to be no disagreement that the affected wells were taken out of use in 1987. The earliest claim made by any Plaintiff was in 1999, after the ten-year period of repose had expired.  The Plaintiffs' claims, therefore, are barred.  However, the Plaintiffs now argue that there is a factual dispute as to when the Government took its last action that would start the repose clock ticking.  The Plaintiffs offer two theories: (1) the Government continued to make omissions during the ten-year period of repose; and (2) newly discovered evidence gives rise to a recent duty to warn claim

---

[79] See Wilson, 327 N.C. at 518, 398 S.E.2d at 600 (where landowners knew of presence of underground tanks, they could not avail themselves of six year statute of repose and § 1-52(16) applied).

not barred by the statute of repose.  The Plaintiffs point to a 2012 report of the Agency of Toxic Substances Disease Registry ("ATSDR") that contamination also occurred at the Hadnot Point fuel farm and that contamination by chlorinated solvents occurred in the drinking water at Camp Lejeune from at least 1957 through 1987. The Plaintiffs contend that the Government failed to warn of this contamination and engaged in fraudulent concealment of information.

Specifically, the Plaintiffs allege: (1) the Government delayed sufficient testing and shut down of the impacted wells from at least 1982 and reliable testing was not reported until 2010, (2) the Government covered up the causal link between contamination and injuries by concealing information about groundwater contamination, (3) the Government continues to "instill confidence" in those exposed that there is no link between the contamination and injury and "instill doubt" in the minds of victims that there was any problem, (4) the Government repeatedly attempted to hide information about contamination, (5) the Government did not notify victims of potential contamination until 2008 and the notification letter, itself, continued the Government's concealment, and (6) all of these acts caused victims to delay seeking treatment for latent diseases and to delay filing suit.[80]

---

[80]    See Doc. No. [160], at 25-28 (collecting allegations from various complaints).

The Government responds that (1) these claims are still barred by the statute of repose if the underlying conduct occurred more than ten years before a claim was filed because the statute of repose does not run anew with every occurrence of continuing acts or omissions that fail to ameliorate an injury and alternatively (2) these claims would be barred by the discretionary function exception under the FTCA.

In Hodge v. Harkey,[81] the plaintiffs – neighboring landowners – filed suit against a gas station and the oil company that supplied the station with gas, alleging that their property had become contaminated from underground storage tanks at the gas station.  The defendants raised the ten-year statute of repose contained in § 1-52(16).  The plaintiffs responded that the defendants were either obligated to or undertook certain repairs and remediation efforts which tolled the statute of repose. The court rejected the plaintiffs' arguments.[82]  "This Court has previously held that a statute of repose containing 'no action' language barred all claims, including claims seeking to extend liability for subsequent repairs or remedial measures."[83]  Similarly,

---

[81]     178 N.C. App. 222, 631 S.E.2d 143 (2006).

[82]     Id. at 226, 631 S.E.2d at 146.

[83]     Id. (citing Whitehurst v. Hurst Built, Inc., 156 N.C. App. 650, 577 S.E.2d 168 (2003); Monson v. Paramount Homes, Inc., 133 N.C. App. 235, 515 S.E.2d 445 (1999)).

36

in <u>Monson</u>, the court held that "[t]o allow the statute of repose to toll or start running anew each time a repair is made would subject a defendant to potential open-ended liability for an indefinite period of time, defeating the very purpose of statutes of repose. . . ."[84]   North Carolina holds that "[s]ubstantive rights, such as those created by the statute of repose are not subject to tolling."[85]

These decisions are not surprising.   The Supreme Court in <u>Waldburger</u> addressed the unique nature of statutes of repose.   The Court explained that a "statute of repose . . . puts an outer limit on the right to bring a civil action.   That limit is measured not from the date on which the claim accrues but instead from the date of the last culpable act or omission of the defendant."[86]   Because the repose is not related to the accrual of the cause of action, it is the "equivalent" to a "cut off" or an

---

[84]   133 N.C. App. at 240, 515 S.E.2d at 449; <u>see</u> <u>also</u> <u>Brown v. American Multimedia, Inc.</u>, 170 N.C. App. 697, 614 S.E.2d 606 (Table), 2005 WL 1330919 (N.C. App. June 7, 2005) (applying statute of repose despite plaintiffs' characterization of claims as "contribution" or "fraudulent failure to reveal material information" because repose "establishes a fixed limit as to when entities, such as landowners, can expect to no longer be exposed to lawsuits for damage to property" and court would not "allow end-run around the statute of repose that would ignore a clear mandate to the contrary and undermine the chief virtue of the statute, its certainty").

[85]   <u>See</u> <u>Stallings v. Gunter</u>, 99 N.C. App. 710, 716, 394 S.E.2d 212, 216 (1990) (holding that "fraudulent concealment . . . cannot operate to toll the running of the statute of repose").

[86]   <u>CTS Corp. v. Waldburger</u>, ___ U.S. ___, 134 S. Ct. 2175, 2182 (2014).

"absolute bar" that may take place prior to the occurrence of discovery of an injury.[87]

The Court explained that a "statute of repose is a judgment that defendants should be free from liability after the legislatively determined period of time, beyond which the liability will no longer exist and will not be tolled for any reason."[88]  Accordingly, "[s]tatutes of repose . . . generally may not be tolled, even in cases of extraordinary circumstances beyond a plaintiff's control."[89]

For these reasons, the court finds that any failure to warn claims – including alleged "renewed" duty to warn of the release of the ATSDR report – do not "toll" or restart the statute of repose.  The court GRANTS the Government's motion to dismiss [127].  The court finds that all the Plaintiffs' claims based on North Carolina law are barred by the ten-year statute of repose contained in North Carolina General Statute § 1-52(16).  Nonetheless, in the alternative, the court addresses below whether the discretionary function exception under the Federal Tort Claims Act would also apply to the Plaintiffs' North Carolina law claims as well as encompass the newly alleged claims that might be governed by law other than North Carolina.[90]

---

[87]    Id. at 2183.

[88]    Id. (quotation and citation omitted).

[89]    Id.

[90]    As the court explains below, in their proposed amended complaints, several Plaintiffs allege claims of wrongful death or loss of consortium based on law

### B.     Motion to Dismiss (<u>Feres</u>)

The Government argues that for those Plaintiffs who were service members at the time their claims accrued, in addition to the North Carolina statute of repose, the <u>Feres</u> doctrine also bars any recovery against the United States under the Federal Tort Claims Act for claims directly related to the contamination of the water supply as well as for any alleged failure to warn of the contamination.  The Plaintiffs respond that these service members were not always on active duty at Camp Lejeune and the <u>Feres</u> doctrine should not be applied when there are times of furlough or inactive service.  The Plaintiffs further argue that the court should not consider the failure to warn claims as one unified claim, but rather the court should find the <u>Feres</u> doctrine applies only to the times upon which the Government's obligation to warn arose while a particular plaintiff was on active duty as a service member.[91]

---

other than North Carolina.  The Plaintiffs argue that those claims are not governed by the North Carolina law and the North Carolina statute of repose.  The Government responds that under the Federal Tort Claims Act, those claims would still be governed by North Carolina law no matter where a wrongful death occurred.  <u>See</u> Doc. No. [170], at 4-7 (citing <u>inter alia</u> <u>Gould Elecs. Inc. v. United States</u>, 220 F.3d 169 (3d Cir. 2000) and <u>Simon v. United States</u>, 341 F.3d 193, 196 (3d Cir. 2003)).  The court need not tackle this complex choice of law question because it determines below that these claims are also barred by the discretionary function exception.

[91]     The court notes that the Plaintiffs make other less than persuasive policy arguments concerning the application of the <u>Feres</u> doctrine.  <u>See</u> Doc. No. [71], at 29 (arguing Government has duty to warn based on "moral imperative"); Doc. No. [176], at 14 ("this Court – or another – deserves a chance to stand up to defeat the outrageous doctrine of <u>Feres</u> that has taken our courts so far from the plain language

It has long been established that the "Government is not liable under the [FTCA] for injuries to servicemen where the injuries arise out of or are in the course of activity incident to service."[92] The court considers three factors: "(1) duty status, (2) location, and (3) activity, to determine whether a service member's injuries resulting from government negligence . . . are incident to service [,]" and thus subject to the doctrine announced in Feres.[93]   The Eleventh Circuit has held that "the serviceman's duty status was the most important criterion in determining whether an injury was incident to military service."[94] "Where the claimant is injured on base while on 'active duty,' Feres applies virtually as a matter of law."[95]

_____

of the statute that Feres pretends to interpret so as to be absurd").

[92]   Feres v. United States, 340 U.S. 135, 146 (1950); see also United States v. Brown, 348 U.S. 110 (1954); Brooks v. United States, 337 U.S. 49 (1949).

[93]   Whitley v. United States, 170 F.3d 1061, 1070 (11th Cir. 1999).

[94]   Jimenez v. United States, 158 F.3d 1228, 1229 (11th Cir. 1998) (per curiam).

[95]   Starke v. United States, 249 F. App'x 774 (11th Cir. 2007).  The parties expend a great deal of energy on the question of whether the Government's motion to dismiss on the basis of the Feres doctrine should be considered under Federal Rule of Civil Procedure 12(b)(1) or 12(b)(6).  See, e.g., Carmichael v. Kellogg, Brown & Root Servcs., Inc., 572 F.3d 1271, 1279 (11th Cir. 2009) (explaining facial attack based solely on allegations in complaint is addressed by Rule 12(b)(6) while factual attack including information outside complaint considered under Rule 12(b)(1)).  The court need not address this issue because it is clear no matter whether considering material outside the complaints or not, the claims of active service members are barred by the Feres doctrine.

Here, there is no dispute that for at least part of their time in service Plaintiff military service members were on active duty at Camp Lejeune. Thus, it is clear that the claims of those service members that accrued while they were on active duty are barred by the <u>Feres</u> doctrine. The Plaintiffs' alleged exposure to contaminated water occurred over a period of time. This is not a situation where one incident is the cause of injury and whether the service member was on active duty or on furlough at the time of that singular incident can be readily determined.[96] There is no way to parcel the Plaintiffs' alleged injuries between times of active duty and times of furlough. Given the policy considerations behind the <u>Feres</u> doctrine, the court rejects the Plaintiffs' argument that if the service member was not on active duty for every single day of his time as a service member then <u>Feres</u> cannot apply.[97]

---

[96]   <u>Cf.</u> <u>Elliott v. United States</u>, 13 F.3d 1555 (11th Cir. 1994) (holding <u>Feres</u> doctrine did not apply to claim service member seriously injured by carbon monoxide poisoning while sleeping in base housing while on leave), <u>vacated</u> <u>by</u> 28 F.3d 1076 (11th Cir. 1994), and 37 F.3d 617 (11th Cir. 1994) (district court order affirmed by operation of law due to equally divided en banc court).

[97]   <u>See</u> <u>also</u> <u>Gros v. United States</u>, 232 F. App'x 417 (5th Cir. 2007) (per curiam) (finding same claims of injury due to contamination by former service member stationed at Camp Lejeune barred by <u>Feres</u> doctrine); <u>Perez v. United States</u>, Civil Action No. 09-22201 (S.D. Fla. June 14, 2010) (Jordan, J.), Slip op., at 6 ("although it is not exactly clear what precise activity or activities Mr. Perez was engaged in every single time he drank or used the contaminated water at the Camp, it is undeniable that he drank and used the water while performing at least some military activities in 1985 and 1986"), attached at Doc. No. [61], Ex. F.

As to the second factor, these service members were clearly located on the Camp Lejeune base which points to the application of the <u>Feres</u> doctrine.  Finally, while the Plaintiffs were not always engaged in a "military" activity, <u>Feres</u>, itself, makes clear that sleeping while stationed on active duty at a military base is an activity "incident to service" and therefore satisfies the third factor.[98]  Accordingly, the court finds that the claims raised by the Plaintiffs when they were service members are barred by the <u>Feres</u> doctrine.

More complicated are the "failure to warn" claims of service members arising after their discharge from service.[99]  In <u>Cole v. United States</u>,[100] the court considered the claims of the representatives of a deceased service member who alleged that the

---

[98]    <u>See Feres</u>, 340 U.S. at 135 (holding service member acting "incident to service" when he was killed in fire while off-duty and sleeping in his barracks).

[99]    Given the procedural posture of this litigation, the court assumes for the purposes of discussion that the Plaintiffs are able to state a claim for a "new duty to warn" on the part of the Government which arose at least for some service member Plaintiffs after they were discharged.  The court, however, is mindful of the comments by Judge Jordan while he considered this claim in <u>Perez v. United States</u>, before that case was transferred to the instant MDL. <u>See</u> Civil Action No. 09-22201 (S.D. Fla. June 14, 2010), Slip op., at 5 n.2 ("Given the government's alleged long-standing knowledge that TCE is hazardous to human health, it may be very difficult for the plaintiffs to prove that a new duty to warn arose from the alleged new knowledge about TCE's carcinogenic qualities after Mr. Perez's discharge in 1987 and before the government notified Mr. Perez of the water contamination in 2008.  But that is not the issue at this early stage."), attached at Doc. No. [61], Ex. F.

[100]    755 F.2d 873 (11th Cir. 1985).

42

Government should have known of the dangers of radiation exposure experienced on a ship used for atomic bomb testing but failed to warn the service member.  In particular, the plaintiffs claimed that after the service member was discharged from active duty, the Government's knowledge of the dangers "expanded" to the point where a "new duty to warn" was triggered.[101]

The court recognized that the courts of appeal "universally applied the <u>Feres</u> doctrine to bar such suits in which the duty to warn originated when the injured serviceman was in the armed forces and merely continued after discharge."[102]  But the <u>Cole</u> court found that the plaintiffs' allegations of post-discharge conduct by the Government would take the claim outside of the <u>Feres</u> bar.  The Court stated:

> Our review of the law in this area suggests that in a case alleging a failure by the government to warn of in-service active-duty exposure to hazardous substances, the crucial inquiry is whether the purported conduct of the government giving rise to the plaintiff's cause of action occurred while the injured party was still a member of the armed forces. Under this standard, the claim in the plaintiffs' proposed amendment would not be barred by the <u>Feres</u> doctrine. The relevant 'injury' here is the aggravation or perpetuation of Cole's radiation-induced condition due to the government's failure to discharge its new duty to warn.  It is urged that the conduct by the United States causing this injury occurred entirely after he left the service.[103]

---

[101]   <u>Id.</u> at 875.

[102]   <u>Id.</u> at 876 (collecting cases); <u>see</u> <u>also</u> <u>Stanley v. Central Intelligence Agency</u>, 639 F.2d 1146 (5th Cir. Unit B 1981).

[103]   <u>Id.</u> at 877 (footnotes and citations omitted).

Cole contains an extensive policy discussion of why the court found that the post-discharge allegations did not implicate the policy behind Feres.[104]

The court, however, need not resolve whether the "post-discharge" failure to warn claims would survive Feres because the Government argues in the alternative that even if they do under Cole, the Plaintiffs' failure to warn claims are barred by the discretionary function doctrine.  The court addresses this argument below.  For the foregoing reasons, the court GRANTS the Government's motion to dismiss on the basis of the Feres doctrine [61]; DENIES AS MOOT the Plaintiffs' motion for oral argument [72]; DENIES AS MOOT the Plaintiffs' motion for extension of time to complete discovery and to stay [83]; and GRANTS the Government's motion to dismiss as to the Feres doctrine [127].

## C.   Motion to Dismiss (Discretionary Function Exception)[105]

_____

[104]   Id. at 877-80; see also Maas v. United States, 94 F.3d 291, 295-98 (7th Cir. 1996) (permitting post-discharge failure to warn claims as outside Feres doctrine).

[105]   The court recognizes that one of the cases originally consolidated into the MDL was further along in the pipeline than the others.  See Laura Jones v. United States, Civil Action No. 7:09-CV-106-BO (E.D.N.C.).  In Jones, the Honorable Terrence Boyle, in the United States District Court for the Eastern District of North Carolina, held that the statute of repose did not apply to Jones' claims.  See Jones v. United States, 751 F. Supp. 2d 835 (E.D.N.C. 2010).  Shortly after the MDL was consolidated in the Northern District of Georgia, the court considered briefing from the parties as to whether the Jones decision had any binding precedential effect on the court's analysis going forward.  In the interim, however, the court dismissed Plaintiff Jones on the basis of judicial estoppel.  Thus, Jones, was no longer part of the MDL

44

The Plaintiffs raise a variety of negligence claims against the Government: (1)

_____

and the court did not need to reach any conclusions as to the precedential effect of Judge Boyle's order.

In a brief discussion in a separate order, Judge Boyle concluded that certain Navy regulations and base orders gave mandatory direction to the Government with respect to the water supply system at Camp Lejeune and therefore the discretionary function exception did not apply. See Jones v. United States, 691 F. Supp. 2d 639 (E.D.N.C. 2010). The Plaintiffs again argue in their response to the Defendant's motion to dismiss on the basis of the discretionary function exception that Judge Boyle's order in Jones should be "law of the case" in this MDL despite the fact that Jones was dismissed.

The Plaintiffs rely on two cases for their "law of the case" argument. See In re Ford Motor Co., 591 F.3d 406 (5th Cir. 2009) and In re Pharmacy Benefit Managers Antitrust Litig., 582 F.3d 432 (3d Cir. 2009). But Ford discusses the obligations of the "transferor" court in receiving the orders of the "transferee" court in an MDL. Although perhaps confusing, the "transferee" court in these cases is the court in front of which the MDL was consolidated. The "transferor" court is the court in which the individual case originated. Of course, at the conclusion of the pretrial MDL proceedings, the MDL "transferee" court returns the individual case to the originating "transferor" court. It is this "remand" after completion of the pretrial matters that occupies the analysis in Ford. That is not the situation before this MDL court in determining whether Judge Boyle's orders are "law of the case."

Even Pharmacy Benefit Managers – which discusses the deference the MDL court should give to an order already entered in a transferred action – does not mandate that the MDL court accept all previous rulings made in a case. Pharmacy Benefit Managers recognizes that the "law of the case" doctrine is a discretionary doctrine. The MDL "transferee" court may take into account the degree to which a "transferor" court may have analyzed a particular legal issue. See In re Bank of America Wage & Hour Emp't Litig., MDL No. 2138, 2010 WL 4180530 (D. Kan. Oct. 20, 2010) (declining to consider order of transferor court as "law of the case" where basis of order "unknown").

In any event, as it found above, the court need not reach any conclusion about the "law of the case" because the Jones case has been dismissed. But the court notes that the discretionary function exception is a very significant feature of this litigation. It is difficult for the court to perceive that the decision from an individual case would bind the remaining MDL cases before any opportunity for all parties to conduct discovery and engage in briefing and argument on the issue.

disposal of pollutants and contaminants at Camp Lejeune, (2) failure to protect the Camp Lejeune water supply from contamination, (3) failure to investigate and remediate contamination, and (4) failure to adequately warn inhabitants of exposure to contaminated water.  The Government contends that even if these claims were not barred by the statute of repose, the Plaintiffs' negligence and "failure to warn" claims are also barred by the "discretionary function" exception to the Federal Tort Claims Act.  The Plaintiffs respond that the discretionary function exception is not applicable because the regulations issued by the Navy Bureau of Medicine and Surgery ("BUMEDs") as well as other regulations provided mandatory duties and specific courses of action with respect to safe water supply such that the Government's obligations in this area were ministerial and not discretionary.  The Plaintiffs further argue that the Government made the choice to provide its own water supply at Camp Lejeune rather than use the local municipality's water, and thus, these actions become akin to business or routine maintenance of property.

As the court explains above, there are exceptions to the Government's liability under the FTCA.  One of those is the "discretionary function" exception contained in 28 U.S.C. § 2680(a).[106]  "These exceptions must be strictly construed in favor of the United States, and when an exception applies to neutralize what would otherwise

---

[106]   See, e.g., Zelaya v. United States, 781 F.3d 1315, 1322 (11th Cir. 2015).

be a waiver of immunity, a court will lack subject matter jurisdiction over the action."[107]

Section 2680(a) exempts from FTCA liability:

(a) Any Claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.[108]

"In short, the discretionary function exception serves to preserve sovereign immunity for any claim that is based on a federal agency or employee's performance or nonperformance of a discretionary task, even if, in so acting, the agency employee may have abused his discretion."[109]

"In guiding the courts' application of the discretionary function exception, the Supreme Court has formulated a two-part test. First, the conduct that forms the basis of the suit must involve an element of judgment or choice by the employee."[110] "In determining whether judgment or choice is present in the particular conduct at issue,

---

[107]     Id. (quotation and citation omitted).

[108]     Id.

[109]     Id. at 1329.

[110]     Id. (citing Berkovitz v. United States, 486 U.S. 531, 536 (1988)).

47

the inquiry focuses on whether the controlling statute or regulation mandates that a government agent perform his or her function in a specific manner."[111] "If a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow, the Government will have failed to show that the action at issue allowed for the employee's exercise of judgment or choice because, in that case, the employee had no rightful option but to adhere to the directive."[112] "Conversely, unless a federal statute, regulation, or policy specifically prescribes a course of action embodying a fixed or readily ascertainable standard, it will be presumed that the particular act involved an element of judgment or choice."[113]

"If the Government has met this first element of the test for applying the exception, then the second part of the test requires the court to determine whether that judgment is of the kind that the discretionary function exception was designed to shield."[114] "A particular decision will be of the kind protected by the exception if it is the type of decision that one would expect to be inherently grounded in considerations of policy."[115]  "Indeed, when a government agent is permitted to

---

[111]   Id. (quotations and citations omitted).

[112]   Id. at 1329-30 (quotation and citation omitted).

[113]   Id. at 1330 (quotation and citations omitted).

[114]   Id. (quotation and citation omitted).

[115]   Id.

exercise discretion in making a particular decision – whether that permission is express or implied – it must be presumed that the agent's acts are grounded in policy when exercising that discretion."[116]  "Finally, in examining whether an employee's discretion is of the type grounded in public policy, one uses an objective test, and the employee's subjective intent is irrelevant."[117]

The court finds here that its ruling on the discretionary function exception is a matter properly considered under Rule 12(b)(1) subject-matter jurisdiction.[118] Because the court permitted a period of discovery on the discretionary function exception, the court finds that this is not simply a facial challenge to which the court would need to assume the truth of the allegations in the complaints and proposed amended complaints, rather the court views this as a factual challenge pursuant to which the Plaintiffs bear the burden of proof to show that a waiver of sovereign

---

[116]     Id. (quotation and citation omitted).

[117]     Id.; see also United States v. Gaubert, 499 U.S. 315, 325 (1991) (focus of inquiry is "not on the agent's subjective intent . . ., but on the nature of the actions taken and on whether they are susceptible to policy analysis").

[118]     See Zelaya, 781 F.3d at 1338-39 (detailed discussion on jurisprudential considerations of Rule 12(b)(6) or Rule 12(b)(1) dismissal).  Further, for the same reasons as addressed in Zelaya, the court finds the result would be the same whether the court considered the arguments pursuant to Rule 12(b)(1) or Rule 12(b)(6).  Id.

immunity exists.[119] Thus, the court may consider matters outside of the pleadings to determine whether it has subject-matter jurisdiction.[120]

Based on the arguments presented by the Plaintiffs, the court finds there is some confusion in the briefing in distinguishing between the issue of negligence and the issue of whether a specific federal statute or regulation provided guidance such that any action taken or not taken was not a matter of discretion, but rather was mandatory.   For this reason, the court finds it useful to give more measured consideration to Autery v. United States.[121] In Autery, the plaintiffs filed suit against the United States for death and injuries sustained by passengers in an automobile when two black locust trees fell on their car in the Great Smoky Mountain National Park.  Over a decade before the accident, the National Park Service had issued a "directive" which stated:

---

[119]    See, e.g., Odyssey Marine Exploration, Inc. v. Unidentified Shipwrecked Vessel, 657 F.3d 1159, 1169 (11th Cir. 2011); OSI, Inc. v. United States, 285 F.3d 947, 951 (11th Cir. 2002).  Citing Whisnant v. United States, 400 F.3d 1177, 1181 (9th Cir. 2005), the Plaintiffs argue that the Government bears the burden of demonstrating the applicability of the discretionary function exception.  The Eleventh Circuit does not apply the burden in the same manner as the Ninth Circuit.  See also S.R.P. ex rel. Abunabba v. United States, 676 F.3d 329, 333 (3d Cir. 2012) (holding Government bears burden of proving discretionary function exception).

[120]    See, e.g., McMaster v. United States, 177 F.3d 936, 940 (11th Cir. 1999).

[121]    992 F.2d 1523 (11th Cir. 1993).

> Protection of the visitor, and park and concessioner employees, from violations of laws and regulations and from hazards inherent in the park environment, is a prime responsibility of the National Park Service. The saving and safeguarding of human life takes precedence over all other park management activities, whether the life is of the visitor, concessioner, or park employee. . . .[122]

Pursuant to that directive, the unwritten policy at the time of the accident was to "make every reasonable effort within the constraints of budget, manpower, and equipment available to detect, document, remove, and prevent tree hazards."[123] Under this policy, rangers would visually inspect trees and report back any known hazardous trees for removal.[124]  Natural resources specialists at the Park were also aware of the special danger facing black locust trees due to bore infestation and the accompanying recommendation to remove such trees.[125]   Park personnel met to discuss the information about black locust trees.[126]

---

[122]   Id. at 1525.

[123]   Id.

[124]   Id.

[125]   Id.

[126]   Id.

51

In carefully considering both <u>United States v. Gaubert</u>,[127] and <u>Berkovitz v. United States</u>,[128] the <u>Autery</u> court first analyzed what policy issue was before it.  The court stated:

> The district court's inquiry, on the other hand, by asking whether the park officials had discretion to remove "hazardous" trees, begs the question. The tree inspection program was designed to identify which trees were hazardous. Whether park personnel had discretion in executing that plan is the relevant issue. The district court's analysis appears to collapse the question of whether the Park Service was negligent into the discretionary function inquiry. That is, after finding that the Park Service had knowledge of the danger of black locust trees, the district court imposed a "reasonableness" requirement on the government's conduct.[129]

The court found, instead, that it "is the governing administrative policy, not the Park Service's knowledge of danger, however, that determines whether certain conduct is mandatory for purposes of the discretionary function exception. The FTCA expressly provides that the exception applies to policy judgments, even to those constituting abuse of discretion."[130]  The court further stated "the relevant inquiry here is whether controlling statutes, regulations and administrative policies mandated that the Park Service inspect for hazardous trees in a specific manner. If not, then the Park

---

[127]   499 U.S. 315 (1991).

[128]   486 U.S. 531 (1988).

[129]   992 F.2d at 1528 (footnote omitted).

[130]   <u>Id.</u> (quotation and citation omitted).

officials' decision to employ a particular inspection procedure—and its execution of that plan—is protected by the discretionary function exception."[131]

The Autery court found that the Park Service had granted rangers discretion in inspecting trees and in determining which trees should be removed.  The court distinguished Phillips v. United States,[132] noting that the tree inspection plan did not "compel park employees to inspect certain trees on certain days or remove a particular number of trees per week."[133] Ultimately, the Autery court found that there was no specific mandatory policy that removed discretion; and that the decisions of the Park rangers were grounded in social, economic, and public policy such that the discretionary function exception applied.[134]

Similarly, here, the Plaintiffs argue that the Government failed in following the regulation that the water supply at Camp Lejeune should not be contaminated.  But whether contamination occurred due to negligence is not the relevant inquiry; rather the question is whether any federal statute or regulation presented sufficiently specific instructions to base personnel on how to provide for a safe water supply.

---

[131]   Id.

[132]   956 F.2d 1071 (11th Cir. 1992).

[133]   992 F.2d at 1529.

[134]   Id. at 1530-31.

1.    <u>Federal Statute or Regulation</u>

The first step on the discretionary function analysis is whether the conduct of the officials at Camp Lejeune was controlled by a statute or regulation that mandated the government agent perform in a specific manner.  Over the course of the litigation, the Plaintiffs have pointed to several different federal statutes or regulations they believe set forth mandatory duties on the part of the Government.[135]  Although there is no master complaint at this point in the litigation, the court will consider all arguments raised by the Plaintiffs in their briefing and in their proposed amended complaints.  In their first response to the Government's motion to dismiss on the basis of the discretionary function exception, the Plaintiffs argued that mandatory obligations were set forth in the 1974 Federal Safe Drinking Water Act and its 1996 amendments.[136]

The Safe Drinking Water Act of 1974 authorized the Environmental Protection Agency to regulate drinking water standards for public water supplies.[137]  The EPA

---

[135]    The Plaintiffs sporadically make reference to the fact that they requested and did not receive certain items from the Government in discovery.  The court is not persuaded by these comments as the Plaintiffs did not pursue any recourse with the court during the period of discovery on the <u>Feres</u> doctrine and the discretionary function exception.

[136]    <u>See</u> Doc. No. [136], Plaintiff Bryant's Proposed Amended Complaint, ¶¶ 106-07.

[137]    <u>See</u> 42 U.S.C. §§ 300f <u>et</u> <u>seq.</u>

established a priority of substances it would begin to regulate and it began to set Maximum Contaminant Levels as enforceable standards.[138]  The initial list, effective in 1977, contained only ten substances, none of which were the relevant contaminants to Camp Lejeune.[139]  Under a general category of "chlorinated hydrocarbons," the EPA regulated four pesticides – endrin, lindane, methoxychlor, and toxaphene.[140]

In the early 1980s, the Environmental Protection Agency announced that it would begin the process of developing regulations for volatile organic chemicals such as those at issue here.[141]  The chemicals that the Plaintiffs specify in their complaints are benzene, trichloroethylene (TCE), tetrachloroethylene (PCE), dichloroethene (DCE), and vinyl chloride.  The Government's expert, Dr. Davis Ford, testified that the DCE and vinyl chloride detected in the ground at Camp Lejeune are "daughter products" of PCE and TCE and likely resulted from the use and disposal of TCE and PCE at Camp Lejeune.[142]  He further noted that benzene is generally present in the

---

[138]   See 48 Fed. Reg. 45502 (Oct. 5, 1983).

[139]   See Doc. No. [79], Ex. 36.

[140]   See Doc. No. [62], Ex. 14 (40 Fed. Reg. 59570 (Dec. 24, 1975)).

[141]   Id.

[142]   See Doc. No. [62], Ex. 9 at 17.

environment, usually as a result of industrial activities, storage tanks, and vehicle maintenance.[143]

In 1984, the EPA issued a proposal for "recommended" maximum contamination levels for TCE, PCE, DCE, and vinyl chloride.[144] It was not until 1989 that the EPA issued final regulations for enforceable maximum contamination levels for benzene, TCE, and vinyl chloride.[145] Final levels for DCE and PCE were not effective until 1992.[146] Likewise, and significantly, the BUMEDs did not specifically list benzene, vinyl chloride, TCE, and DCE until the 1993 update to BUMED 6240.10 *after* the Camp Lejeune contaminated wells were closed.[147]

The Plaintiffs also refer to Base Order 5100.13B governing the Safe Disposal of Contaminants or Hazardous Waste (including organic solvents) which provides that commanders and officers will "cause periodic inspections to be made of

---

[143]    Id. at 12-13.

[144]    Id., Ex. 37.

[145]    See Doc. No. [62], Ex. 10.

[146]    Id., Exs. 9 and 11.

[147]    Id., Exs. 18 (noting that these substances only recently had "maximum contamination levels" set by EPA) and 19 (adding tetrachloroethylene (PCE) to BUMED instruction based on newly enacted EPA regulation).

contaminants and hazardous materials in stock to determine serviceability."[148]  The

Base Order also states that the Base Safety Manager "will direct safe disposition of

subject waste not salable or usable."[149]

The Plaintiffs rely most extensively[150] on the following provisions of the

BUMEDs:

> 6a.    The water supply should be obtained from the most desirable
> source which is feasible, and effort should be made to control
> pollution of the source.  If the source is not adequately protected
> by natural means, the supply shall be adequately protected by
> treatment.[151]

The BUMED further specified that "adequate protection by treatment means any one

or any combination of the controlled processes of coagulation, sedimentation,

---

[148]    See Base Order, § 4a.  The Base Order is attached as Exhibit 9 to the Plaintiffs' response to the  Defendant's motion to dismiss on the basis of the discretionary function exception.  See Doc. No. [70].

[149]    Id. at § 4a(3).

[150]    The Plaintiffs specifically disavow any reliance on the Clean Water Act, the Resource Conservation Recovery Act ("RCRA") or Suggested No Adverse Response Levels ("SNARLS").  See Doc. No. [70], at 6 n.4.  To the extent that any individual Plaintiff would rely on the SNARLS, see Doc. No. [126], ¶¶ 52-54, as the name indicates, such levels were only "suggested" and therefore could not form the basis of any specific mandatory direction to base officials.

[151]    See BUMED 6240.3B (effective September 30, 1963); BUMED 6240.3C (effective August 25, 1972).  The 1963 BUMED is attached as Exhibit 2 to the Plaintiffs' response to the Defendant's motion to dismiss on the basis of the discretionary function exception.  See Doc. No. [70].  The 1972 BUMED is attached as Exhibit 6.

AO 72A
(Rev.8/82)

absorption, filtration, disinfection or other processes which produce a water consistently meeting the requirements of these standards."[152]

It continued:

> 6b.    Frequent sanitary surveys shall be made of the water supply system to locate and identify health hazards which might exist in the system.[153]

A "health hazard" is defined as including "a structural defect in the water supply system, whether of location, design, or construction which may regularly or occasionally prevent satisfactory purification of the water supply or cause it to be polluted from extraneous sources."[154]

Moreover, section 7 of the BUMED discussed the standards or limits generally contained in the 1962 Public Health Service Drinking Water Standards.

> 7(c). Chemical characteristics: limits.  Drinking water shall not contain impurities in concentrations which may be hazardous to the health of the consumers.  It should not be excessively corrosive to the water supply system.  Substances used in its treatment shall not remain in the water in concentration greater than required by good practice.  Substances which may have deleterious physiological effect, or for which physiological effects are not known, shall not be introduced into the system in a manner which would permit them to reach the consumer.[155]

---

[152]    Id., § 5b.

[153]    Id., § 6b.

[154]    Id., § 5d.

[155]    Id., § 7c.

The 1972 BUMED specifies that the "presence of the following substances in excess of the concentrations listed shall constitute grounds for rejection of the supply [listing values for specific substances]." Under "pesticides" one of those substances was listed as "chlorinated hydrocarbons."[156]

The Plaintiffs then allege that the Government was "fraudulent" and "willfully and wantonly negligent in failing to follow [the] mandate" of the BUMEDs and "failed to exercise due care" by causing or allowing pollutants and contaminants such as "trichloroethylene (TCE), as well as PCE and refined petroleum produces, such as benzene, toluene, ethylbenzene, and xylenes (BTEX)" to leak and contaminate the base water supply.[157]

As to the relevance of the BUMEDs, the court finds <u>OSI, Inc. v. United States</u>,[158] to be most directly applicable to this case. In <u>OSI</u>, a neighboring property owner sued the Government for damages allegedly resulting from contamination caused by the dumping of hazardous substances at Maxwell Air Force base. The plaintiff argued that the decisions made by the Air Force base regarding the disposal of hazardous substances were not subject to the discretionary function exception

---

[156]    <u>See</u> BUMED 6240.3C, § 7(3)d(2).

[157]    <u>See</u> Wright Proposed Am. Cmplt., ¶ 67; Bryant Proposed Am. Cmplt., ¶¶ 262-64.

[158]    285 F.3d 947 (11th Cir. 2002).

because certain manuals that governed landfill disposal decisions created mandatory obligations on the part of the Government.[159]

The court found that the manual in question made it an "objective" to protect water sources in the disposal of hazardous materials.[160]  Ultimately, the OSI court held "that an agency manual which provides only objectives and principles for a government agent to follow does not create a mandatory directive which overcomes the discretionary function exception to the FTCA."[161]  The court also found that the "nature of the military's function requires that it be free to weigh environmental policies against security and military concerns. We hold that the decisions at issue here reflect the kind of judgment that the discretionary function exception is designed to shield."[162]

The Plaintiffs are correct that the BUMEDs use mandatory language with respect to the need to deliver clean drinking water.  Significantly, however, the

---

[159]   Id. at 951.

[160]   Id. (citing to facts as established in Aragon v. United States, 146 F.3d 819, 826 (10th Cir. 1998) which considered same regulations as cited by plaintiff in OSI).

[161]   Id. at 952.

[162]   Id. at 953; see also Slappey v. U.S. Army Corps of Eng'rs, 571 F. App'x 855 (11th Cir. 2014); Snyder v. United States, 504 F. Supp. 2d 136 (S.D. Miss. 2007), aff'd, 296 F. App'x 399 (5th Cir. 2008).

manner in which this objective was to be achieved was left to the agency.  For example, as the Plaintiffs themselves point out, the "grounds for rejection" language is a term of art from the 1962 Public Health Service Drinking Water Standards.[163] But those standards contain discretion because the "grounds for rejection" limits are "limits, which should not be exceeded when more suitable water supplies can be made available" and the limits are "based on factors which render a supply less desirable for use."[164]

The question is not whether Camp Lejeune was under a directive to provide a clean water supply; the question is whether those responsible for the required clean water supply had any discretion in the manner in which that supply was to be achieved.[165]  The fact that BUMEDs were orders that had to be followed by the Marine Corps does not mean that the BUMEDs contained specific mandatory instructions for how to achieve a clean water supply that removed any discretion from

---

[163]     See Doc. No. [70], Ex. 5.

[164]     Id. at 22.

[165]     It is for this reason that the Plaintiffs' emphasis on the testimony of the Defendant's Rule 30(b)(6) witness, Dr. Davis Ford, is inapposite.  See Doc. No. [70], at 26-31.  Dr. Ford clearly testified that BUMEDs were public health directives that could not be disregarded and the BUMEDs contained certain minimum requirements for water quality.  But this testimony does not answer the question in the first step of the discretionary function analysis – whether there was a specific mandatory policy that had to be followed on how to assure water quality.

61

the part of those responsible for the water supply at Camp Lejeune. There simply is no question here but that there were a myriad of discretionary decisions that had to be made about how to provide clean water at Camp Lejeune.[166]

The Base Order also does not specify any particular contaminants and gives base officials discretion to determine whether an item is salable or serviceable and where it should be disposed. There are no mandatory or specific methods of disposal required in the Base Order. Similarly, in <u>Autery</u>, the mandatory directive was that "saving and safeguarding of human life takes precedence over all other park management activities," but the manner in which that prime responsibility was achieved was left to the discretion of the Park Service employees. In <u>Rodriguez v.</u>

---

[166]     Finally, the Plaintiffs point to the provision of the 1972 BUMED which stated that "[f]requent sanitary surveys shall be made of the water supply system" and argue – without citation – that no such surveys were ever conducted. The Government, however, proffered testimony from Julian Wooten, Director of Camp Lejeune's Office of Natural Resources and Environmental Affairs in the 1980s that he had worked in a "potable water" laboratory at Camp Lejeune and had done a variety of testing on substances such as bacteria, chloroform bacteria, possibly salinity, and chlorine and fluoride. <u>See</u> Doc. No. [79], Ex. 39, Wooten Depo., at 1-12, 22-27. The Government has also produced records of water supply evaluations conducted from the late 1950s to the 1970s, including the first six "chlorinated hydrocarbon" pesticides listed in the initial implementation of the Safe Drinking Water Act regulations. <u>See</u> <u>id.</u>, Exs. 40-42. These reports are quite lengthy and detailed. To the extent they address the complexity of providing an adequate water supply, they are more evidence of the fact that decisions with regard to the water supply required a great deal of discretion and the balancing of logistics and capabilities.

United States,[167] the regulations governing the provision of exercise equipment to detainees at an immigration holding facility provided that the facility had to offer "safe" conditions for the use of the equipment, but it did not "point to the manner" in which the facility was to provide those conditions.[168] Thus, the court determined that there was discretion and choice in the manner in which the facility set up the exercise equipment.[169]

The Plaintiffs' own industrial hygiene expert, Andrew Havics, likewise testified that the Safe Drinking Water Act began to set national standards through the issuance of recommended maximum contamination levels and then enforceable maximum contamination levels.[170] But levels for benzene, TCE, and vinyl chloride were not proposed until 1987, and PCBs not proposed until 1991.[171]

The 1972 BUMED referenced by the Plaintiffs only regulates a category of "chlorinated hydrocarbons" as a part of the "pesticides" category. The 1972 BUMED was based on the 1962 Public Health Service Drinking Water Standards which did not regulate any of the "volatile organic solvents" at issue here. As described above,

---

[167]   415 F. App'x 143 (11th Cir. 2011).

[168]   Id. at 146.

[169]   Id.

[170]   See Doc. No. [71], Havics Aff., ¶ 23.

[171]   Id., ¶ 25.

the EPA only regulated "chlorinated hydrocarbons" as part of pesticides.  The Government's experts, Dr. Davis Ford (environmental engineer) and Dr. Remy Hennet (geochemist) both testified that the types of chemicals that caused the relevant contamination here were not regulated prior to 1985 when the Camp Lejeune wells closed.  Dr. Hennet provided testimony about the use of the term "chlorinated hydrocarbon" in the BUMEDs.  He testified that the term "chlorinated hydrocarbon" referred to a class of "pesticides, herbicides, and fungicides" and not the volatile organic compounds such as TCE and PCE.[172]  The Plaintiffs express disdain for the Government's distinction between "pesticides" and "organic solvents" because both are "poisons" and the source does not matter to the "health and welfare of our Marines and their families."[173]  Of course, this is not the applicable inquiry.  The question is whether there were specific mandatory regulations concerning certain substances that the Plaintiffs allege were present in the Camp Lejeune water supply.  When viewed through this lens, whether those substances are characterized as "pesticides" or "organic solvents" is very relevant to the inquiry of whether certain regulations mandated limits as to contaminants.  The Plaintiffs' expert agreed on the characterization of these chemicals.

---

[172]  <u>See</u> Doc. No. [62], Ex. 20, ¶ 5 (Hennet Decl.).

[173]  <u>See</u> Doc. No. [70], at 31-32.

The Plaintiffs offered the testimony of Dr. Benjamin Ross and Steven Amter that it was generally known that organic solvents have "carcinogenic properties" as early as the late 1940s.  But there is no information in the record which would support an argument that there was any specific mandatory regulation from any source governing contamination by volatile organic substances, benzene, TCE, DCE, PCE, or vinyl chloride.  Nor, for that matter, is the Government's knowledge as to the danger of any particular relevance.  As the court noted in <u>Autery</u>, Park Service personnel certainly had knowledge that the black locust trees were dangerous, but they also had the discretion to determine a course of action to deal with that danger. Therefore, the court finds that the Plaintiffs have not established the existence of any mandatory regulation for the relevant contaminant volatile organic compounds until *after* the wells at Camp Lejeune were closed.

The source of the Plaintiffs' contention that the Government had an obligation to "warn" is not clear to the court.  In response to the Government's motion to dismiss on the discretionary function exception, the Plaintiffs argue that a new duty to warn arose from the Safe Water Drinking Act of 1974 and its amendments addressing levels of exposure in 1987 and 1991.  But those pieces of legislation addressed levels of contaminants and did not give any mandatory and specific instruction on the duty to warn individuals no longer served by the drinking water

65

supply.  Accordingly, the court finds that the Plaintiffs have not pointed the court to any mandatory non-discretionary federal regulations that would have directed the Government to warn any former service members.  The first specific notification provisions regarding Camp Lejeune appeared in legislation in 2006 and 2008.[174]

In 2006, Congress mandated that the Government "take appropriate action" to locate and inform former military personnel and residents of the contamination of the water supply after the completion of the study by the Agency for Toxic Substances and Disease Registry ("ATSDR") on the relationship of childhood cancers and birth defects to the contaminated drinking water at Camp Lejeune.[175]  The 2008 Act requires the Secretary of the Navy to "make reasonable efforts to identify and notify directly individuals who were served by the Tarawa Terrace Water Distribution System."[176]  The court finds that neither of these statutes provides specific nor mandatory procedures on notification and such decisions were still within the discretion of the Government.

---

[174]  See Pub. L. No. 109–364, § 318, 120 Stat. 2083, 2143-2144 (Oct. 17, 2006) and Pub. L. No. 110-181, § 315, 122 Stat. 3, 56-57 (Jan. 28, 2008).

[175]  See Pub. L. No. 109–364, § 318, 120 Stat. 2083, 2143-2144 (Oct. 17, 2006).

[176]  See Pub. L. No. 110-181, § 318.

AO 72A
(Rev.8/82)

In her proposed amended complaint, Plaintiff Wright also lists several occasions upon which she contends a duty to warn arose. The Plaintiffs allege that on October 21, 1980, data was collected from various water sources at Hadnot Point on an HHTM Surveillance Form.[177]   The form noted that the water was "highly contaminated with low molecular weight halogenated hydrocarbons."[178]   A second data collection form taken on December 18, 1980 reports "heavy organic interference" with the detection of certain chemical compounds and recommends testing by a different method.[179]   On February 26, 1981, the report indicated that "water highly contaminated with other chlorinated hydrocarbons (solvents)."[180] An August 1982 report of Grainger Laboratories found the presence of chlorinated hydrocarbons which would impact health and therefore were brought to the attention of Camp Lejeune officials.[181]   Exhibit H also contains a series of memos which documents additional testing of samples and analysis performed by Grainger Laboratories with comments from base scientific personnel.[182]   The memos confirm

---

[177]   See Doc. No. [130], Ex. E.

[178]   Id.

[179]   Id., Ex. F.

[180]   Id., Ex. G.

[181]   Id., Ex. H.

[182]   Id.

that trichloroethylene (TCE) and tetrachloroethylene (PCE) were not regulated substances although SNARLS existed for some of the substances.[183]  The memos also generally reflect the beginning efforts to identify the source of the contamination.[184] But nothing in these memos triggered a duty to warn or specified any manner in which to notify residents.

Finally, Plaintiff Wright identifies as an individual act of negligence an April 1982 memo to residents of Tarawa Terrace which noted that the base was having "serious problems" providing sufficient water supply to residents because some wells had been taken out of service due to "trace" amounts of contaminants.[185]

On September 1, 2008, as part of the effort to comply with congressional mandates that the Department of the Navy make efforts to reach all residents of Camp Lejeune, the Navy worked with the Internal Revenue Service to send notices to residents for whom the Navy did not have a current address.[186]  The notice indicated it related to water quality at Camp Lejeune and encouraged individuals to sign up for

---

[183]    Id.

[184]    Id.

[185]    Id., Ex. K; see also Doc. No. [70], at 44-45 (citing at Ex. 15 this 1985 notice to residents of Tarawa Terrace).

[186]    See Doc. No. [164], Ex. F.

a notification registry.[187]  It indicated that unregulated chemicals had been in the water in the early 1980s and the Navy was attempting to assess the health impact.[188] Again, the language of the statute was not specific in the manner in which the Department of Navy should go about making these contacts or the language that should be used in the notifications.  For all of these reasons, the court finds there was no federal statute or regulation that mandated a government agent perform his function in a specified manner.

2.     Implications for Policy Concerns

The second step in the discretionary function analysis is whether the judgment that must be exercised by the Government agents is the kind the discretionary function doctrine was intended to shield.  The Government points out that the policy considerations in this matter included: providing adequate water supply to the base, maintaining military readiness, prioritizing military obligations with limited financial resources, addressing drinking water standards for those substances actually regulated, and working within the greater Department of Defense Installation Restoration Program ("IRP") and the Navy's Assessment and Control of Installation Pollutants ("NACIP").  These two programs encompass the Department of Defense's

---

[187]     Id.

[188]     Id.

consolidated effort to address contaminated military sites throughout the United States through the establishment of priority listings similar to the EPA Superfund site.

As OSI and Aragon make clear, the direction of resources on a military base during the Cold War is a classic illustration of the kind of balancing of national security and economic policies that should be protected by the discretionary function exception.   The court is not persuaded otherwise by the authority cited by the Plaintiffs.  In Gibson v. United States,[189] the plaintiff sued the Department of Navy when he slipped and fell while inspecting FEMA mobile homes to be sold at an auction.  The court likened the Government's role here as the same as any other "business."  But the provision of clean water is a classic government function and not that of a "business."  Furthermore, the disposal of hazardous material is not the type of "routine property maintenance" contemplated in Gibson.  Nor is it the type of problem that can be resolved with "garden-variety remedial steps" as contemplated in S.R.P. ex rel. Abunabba v. United States.[190]

---

[189]    809 F.3d 807 (5th Cir. 2016).

[190]    676 F.3d 329, 338 (3d Cir. 2012).  The court might further note that the Abunabba court actually held that the discretionary function exception applied where the plaintiff was bitten by a barracuda while playing near the shore of a national monument and had alleged that the Government should have posted additional warning signs.  Id. at 338.

Finally, the Plaintiffs argue that the Government should not be permitted to utilize the discretionary function exception because they have alleged that the negligent conduct was marked by individual carelessness or laziness.[191]  It does not appear that the Eleventh Circuit has recognized this carve out to the discretionary function exception.[192]  Moreover, nothing in the allegations made by the Plaintiffs can be characterized by individual carelessness or laziness.  As the court explained above, there is no evidence that the Government refused to conduct water quality surveys. All of the cases cited by the Plaintiffs involved single instances of negligence or failure to conduct some kind of inspection.  The evidence in the record shows that the implications of dumping, leaking, and contamination were not fully understood until the mid-to-late 1980s, when the Government began regulating these substances.  A myriad of policy considerations went into assuring the water supply at Camp Lejeune and later addressing the contamination of the water supply.

---

[191]     See Doc. No. [141], at 21.

[192]     See Rich v. United States, 811 F.3d 140, 147 (5th Cir. 2015) ("The Second Circuit has acknowledged that discretionary conduct cannot be grounded in a policy decision when that conduct is marked by individual carelessness or laziness. See Coulthurst v. United States, 214 F.3d 106 (2d Cir. 2000) (concluding that the discretionary function exception would not apply to a prison official's inspection of faulty weight equipment that caused plaintiff's injuries if that inspection was performed in a 'carelessly inattentive' manner).").

71

Furthermore, it is clear that decisions whether to warn are full of implications for policy concerns.   In <u>Sanchez ex rel. D.R.-S. v. United States</u>,[193] the court considered the claims of residents of the Puerto Rican island of Vieques that the Department of the Navy was negligent in failing to warn them of the dangers of contamination from decades of ammunition use on the island.  The court found that the Navy's decisions in this area were discretionary.  The court distinguished cases of "obvious health hazards" or "easily-correctable danger from environmental effects" and found in contrast that the policy issues as to the accumulated ammunition were significant because the Navy had to "weigh competing interests between secrecy and safety, national security and public health."[194]  In reaching this conclusion, the court relied on cases from the Ninth and D.C. Circuits which held that decisions concerning pollution disclosures by the military were covered by the discretionary function exception.[195]   Even more specifically applicable to the facts here, the

---

[193]     671 F.3d 86 (1st Cir. 2012).

[194]     <u>Id.</u> at 100 (quotation and citation omitted).

[195]     <u>Id.</u> at 101 (citing <u>Loughlin v. United States</u>, 393 F.3d 155 (D.C. Cir. 2004) (holding government's decision to bury toxic World War I munitions under neighborhood without public disclosure subject to policy considerations); <u>In re Consol. U.S. Atmospheric Testing Litig.</u>, 820 F.2d 982 (9th Cir. 1987) (same outcome where government did not disclose radiation dangers from military testing program)); <u>see also</u> <u>Slappey v. U.S. Army Corps of Eng'rs</u>, 571 F. App'x 855 (11th Cir. 2014) ("Indeed, we've repeatedly held that an agency's decision whether to warn, and how to warn, implicates policy concerns for purposes of the discretionary

Sanchez court cited to numerous cases which "hold that the government's decision whether to warn about the presence of toxins, carcinogens, or poisons falls under the discretionary function exception to the FTCA's waiver of sovereign immunity."[196]

_____

function analysis. See, e.g., [U.S.] Aviation Underwriters[, Inc.], 562 F.3d [1297], 1300 [(11th Cir. 2009)] (decision whether to warn pilots of severe clear air turbulence); Monzon v. United States, 253 F.3d 567, 572 (11th Cir. 2001) (decision whether to warn of rip currents)").

[196]    See Sanchez, 671 F.3d at 101-02 ("Ross v. United States, 129 F. App'x 449 (10th Cir. 2005) (discretionary function exception applied to Air Force's decision whether and how to warn neighbors of contamination of ground water by trichloroethylene buried by Air Force); Savary v. United States, No. CV–95–07752, 1999 WL 1178956 (9th Cir. Dec. 14, 1999) (per curiam) (table case) (Jet Propulsion Laboratory's failure to issue warnings to its employees regarding dangers of exposure to soil and groundwater contaminated by hazardous materials fell under the discretionary function exception because the decision to make such a warning required judgments balancing the magnitude of risk associated with contamination with the risks and burdens of a public warning program); Minns v. United States, 155 F.3d 445, 450 (4th Cir. 1998) (military's decision whether to warn veterans about dangers of inoculations or exposure to pesticides fell under discretionary function exception, and 'questioning the military's decision' would create a 'court-intrusion problem'); Maas v. United States, 94 F.3d 291, 297 (7th Cir. 1996) (Air Force's decision not to warn veterans of cancer dangers associated with cleaning up crash site of bomber carrying nuclear weapons fell under discretionary function exception: '[d]eciding whether health risks justify the cost of a notification program, and balancing the cost and the effectiveness of a type of warning, are discretionary decisions'); Angle v. United States, No. 95–1015, 1996 WL 343531, at *3 (6th Cir. June 20, 1996) (per curiam) (table case) (Air Force's decision not to warn occupants of base housing of lead paint contamination fell under discretionary function exception: the Air Force 'had to balance the potential effectiveness of a general warning against the possibility that such a warning might cause unfounded fears'); Daigle v. Shell Oil Co., 972 F.2d 1527 (10th Cir. 1992) (Army's failure to warn residents that cleanup of nearby toxic waste dump could cause exposure to waste fell under discretionary function exception because procedures implementing cleanup implicated policy considerations underlying CERCLA response actions)."

73

The Plaintiffs point to the fact that the Government became aware of elevated levels of contaminants in the early 1980s.  The Government Accounting Office (GAO) study Activities Related to Past Drinking Water Contamination at Marine Corps Base Camp Lejeune (May 2007) discussed the first testing of the water supply at the base in 1980.[197]  The first test lead to additional testing and the understanding in 1982 and 1983 that TCE and PCE were the contaminants.[198]  The Report notes that further testing was not done at that time because the EPA had not yet identified standard acceptable levels for TCE and PCE in a water supply and variations in the test results raised questions about the tests' validity.[199]  It was in 1984 and 1985 as part of the Navy NACIP program that the volatile organic contamination was confirmed and the wells removed from service.[200]  Loughlin notes that a "decision to engage in further study to determine the appropriate" levels is "based on public policy considerations, including the socio-political and economic implications of recognizing an action level in one situation that could not be consistently applied."[201] This is particularly noteworthy here where there is no dispute that the early to mid-

---

[197]   See Doc. No. [62], Ex. 7, at 20-29.

[198]   Id.

[199]   Id.

[200]   Id.

[201]   393 F.3d at 165.

1980s was a period of scientific advancement in the understanding of the dangers of these types of pollutants.[202]   None of this discussion relates to the merits of the Plaintiffs' allegations that the Government was negligent in its provision of water at Camp Lejeune.   Rather, the court holds that the supply of safe water on a military base is a function rife with discretion and the decisions involved are the type the discretionary function doctrine is designed to protect.

        3.    <u>Remaining Claims</u>

---

[202]   Even in the absence of BUMEDs, the Plaintiffs argue that the court should apply a North Carolina statute concerning a continuing duty to maintain premises and inspect for leaking fuel tanks to their negligence claim.  The Plaintiffs contend that North Carolina law imposes on "every person who enters upon an active course of conduct the positive duty to exercise ordinary care to protect others from harm and calls a violation of that duty negligence."  <u>See</u> Doc. No. [70], at 44-45 (citing <u>Quail Hollow E. Condo. Ass'n v. Donald J Scholz Co., et. al.</u>, 47 N.C. App. 518, 522, 268 S.E.2d 12, 15 (1980)).  The Plaintiffs contend that base personnel violated this duty when they issued a notice that stated only trace amounts of several organic chemicals had been found in the water supply.  <u>See</u> Doc. No. [70], at 44-45 (citing Ex. 15 (1985 notice to residents of Tarawa Terrace about limited water supply).  But, as the court explained above, the inquiry here is focused on whether there is any mandatory federal statute or regulation that provides mandatory guidance to Government agents, and not any state law that might provide a standard for negligence liability.  It is not clear to the court whether the Plaintiffs point to this state statute for the purposes of substantive liability or for the purpose of demonstrating that the Government officials here did not have any discretion in their actions because they were mandated by North Carolina law.  If it is the former, the court discusses below that its ruling on the discretionary function exception bars such claims based on state law claims.  If it is the latter, a state statute cannot be the "specifically prescribed course of action" the Government officials had to follow.  <u>See</u> <u>Zelaya</u>, 781 F.3d at 1329 (referring to federal statute, regulation, or policy).

Although the parties have focused their briefing on the claims of negligence with respect to the contamination itself, as well as a failure to warn, the court's analysis applies equally to all other claims proposed by the Plaintiffs.  For example, Plaintiff Bryant's proposed first amended complaint adds the following claims: (1) negligence per se based on BUMEDs, (2) negligence per se based on federal and North Carolina safe drinking water acts, (3) negligence per se based on the deficient notice of warning sent by the Internal Revenue Service on September 1, 2008, (4) loss of consortium under Georgia law, (5) wrongful death and loss of consortium under North Carolina law, (6) negligent breach of the duty to warn, (7) negligent infliction of emotional distress under North Carolina law, (8) Fifth Amendment Due Process, (9) Fourteenth Amendment Equal Protection, (10) negligent breach of warranty or merchantability based on the sale of drinking water in North Carolina, (11) nuisance, and (12) trespass.[203]

The proposed amended complaint by Plaintiff Estate of Grace Wright is not as specific in the claims it intends to bring.  Rather, the Plaintiff simply lists categories of alleged duties without specific reference to statute or obligation.[204]  In any event,

---

[203]    See Doc. No. [164].

[204]    See Doc. Nos. [126] and [130].

the Plaintiff claims: (1) "violation" of BUMED 6240.3 (and other regulations), (2)

duty to warn, and (3) "willful and wanton negligence."

As the court explained above, the Federal Tort Claims Act grants federal

jurisdiction to these claims under § 1346(b)(1) which provides:

> Subject to the provisions of chapter 171 of this title [i.e., 28 U.S.C. §§ 2671–2680], the district courts ... shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.[205]

This is why Zelaya explains that "FTCA was enacted to provide redress to injured

individuals for ordinary torts recognized by state law but committed by federal

employees."[206] But the discretionary function exception provides:

> (a) Any Claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.[207]

---

[205]   28 U.S.C. § 1346(b)(1).

[206]   See 781 F.3d at 1323.

[207]   28 U.S.C. § 2680(a).

77

Thus, the discretionary function exception applies to "any claim based upon an act or omission" of a government employee with respect to the "execution" of a statute or the "performance or the failure to exercise or perform a discretionary function or duty" on the part of a Government agency or employee.  The court finds this language covers all remaining claims made or proposed by the Plaintiffs.

Additionally, Plaintiff Bryant proposes two federal constitutional claims, the first of which is a due process claim in which she contends that the Government violated Mr. Bryant's due process rights by failing to abide by the BUMEDs, the Base Orders, the Federal Safe Drinking Water Act, and the North Caroline Safe Drinking Water Act.[208]  The second is an equal protection claim described as the Government's "fail[ure] or refus[al] to provide Mr. Bryant with the protections from contaminated drinking water afforded to him under military, federal, and state law."[209]

In her proposed amended complaint, the Plaintiff names only the United States as a defendant.  However, claims for damages against the United States for violation of constitutional rights are "barred by the doctrine of sovereign immunity."[210]  For

---

[208]    See Doc. No. [164], ¶¶ 173-78.

[209]    Id., ¶¶ 179-83.

[210]    Boda v. United States, 698 F.2d 1174, 1176 (11th Cir. 1983); see also FDIC v. Meyer, 510 U.S. 471, 485 (1994) ("[W]e implied a cause of action against federal officials in Bivens in part because a direct action against the Government was not available.") (emphasis in original); McMahon v. Presidential Airways, Inc., 502

this reason alone, the court dismisses Plaintiff Bryant's attempt at alleging constitutional claims.

Moreover, in addition to the fact that Plaintiff Bryant's claim is barred by sovereign immunity because it is brought only against the United States, Plaintiff Bryant has not alleged sufficient facts to show that the Government's conduct here "shocks the conscience" so as to state a claim for a due process violation if the Plaintiff were to amend her claim to bring a <u>Bivens</u> action against individual defendants. Typically, substantive due process claims are raised by individuals who are "in custody."[211] In the event, however, that the Plaintiffs here could still raise a substantive due process claim, it must be "conscience shocking."[212] In <u>Waddell</u>, the plaintiffs filed a substantive due process claim against various government officials arising out of an automobile accident caused by a former county jail inmate who had been released early to work as a confidential informant for the county and the DEA. The court undertook a review of the substantive due process clause by noting that:

> [w]e must take seriously the Supreme Court's caution against expanding the concept of substantive due process. . . . The Due Process Clause

F.3d 1331, 1334-35 (11th Cir. 2007) ("government has immunity by default").

[211]   See generally <u>Collins v. City of Harker Heights</u>, 503 U.S. 115 (1992).

[212]   See <u>Waddell v. Hendry Cnty. Sheriff's Office</u>, 329 F.3d 1300 (11th Cir. 2003).

was intended to prevent government officials from abusing their power, or employing it as an instrument of oppression. The substantive component of the Due Process Clause protects individual liberty against certain government actions regardless of the fairness of the procedures used to implement them. But the Fourteenth Amendment must not be used through section 1983 as a font of tort law to convert state tort claims into federal causes of action.[213]

"Thus, conduct by a government actor will rise to the level of a substantive due process violation only if the act can be characterized as arbitrary or conscience shocking in a constitutional sense."[214] The Eleventh Circuit has also noted that the:

Supreme Court has acknowledged that "the measure of what is conscience-shocking is no calibrated yard stick." We know for certain, however, that a showing of negligence is insufficient to make out a constitutional due process claim. And even intentional wrongs seldom violate the Due Process Clause. Acts "intended to injure in some way unjustifiable by any government interest" are "most likely to rise to the conscience-shocking level." But, even conduct by a government actor that would amount to an intentional tort under state law will rise to the level of a substantive due process violation only if it also "shocks the conscience."[215]

In a non-custodial setting, "a substantive due process violation, would, at the very least, require showing of deliberate indifference to an extremely great risk of serious injury to someone in Plaintiff's position."[216]

---

[213]   Id. at 1304-05 (quotations and citations omitted).

[214]   Id. at 1305.

[215]   Id. (citations omitted).

[216]   Id. at 1306.

80

In <u>Dacosta v. Nwachukwa</u>,[217] the court reiterated that the "[s]ubstantive due process doctrine is not a 'font of tort law to be superimposed upon whatever systems may already be administered by the States.'"[218] "Indeed, substantive rights 'created only by state law (as is the case with tort law and employment law) are not subject to substantive due process protection . . . because substantive due process rights are created only by the Constitution.'"[219] "Conduct by a government actor that would amount to an intentional tort under state law would only rise to the level of a substantive due process violation if it 'shocks the conscience' or interferes with rights 'implicit in the concept of ordered liberty' – in other words, only if it affects individual rights guaranteed, explicitly or implicitly, by the Constitution itself."[220]

---

[217]    304 F.3d 1045 (11th Cir. 2002).

[218]    <u>Id.</u> at 1048 (quoting <u>Paul v. Davis</u>, 424 U.S. 693, 701 (1976)).

[219]    <u>Id.</u> (quoting <u>McKinney v. Pate</u>, 20 F.3d 1550, 1556 (11th Cir. 1994) (en banc).

[220]    <u>Id.</u> (quoting <u>United States v. Salerno</u>, 481 U.S. 739, 746 (1987)); <u>see also</u> <u>T.W. ex rel. Wilson v. School Bd. of Seminole Cnty.</u>, 610 F.3d 588, 598 (11th Cir. 2010) ("Due Process Clause protects individuals against arbitrary exercises of government power, but 'only the most egregious official conduct can be said to be arbitrary in the constitutional sense.'" . . . ."Conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to conscience-shocking level."); <u>Nix v. Franklin Cnty. Sch. Dist.</u>, 311 F.3d 1373, 1376 (11th Cir. 2002) ("Acts that fall between the poles of negligence and malign intent require courts to make 'closer calls.'" . . . ."When shaping the contours of due-process law, the [Supreme] Court has often emphasized the need to prevent the Fourteenth Amendment from becoming a surrogate for conventional tort

The Plaintiffs here allege negligence, but there are no sufficient facts in the Plaintiffs' complaints to "shock the conscience."

Plaintiff Bryant also has not offered any basis for why Mr. Bryant is entitled to protection under the Equal Protection Clause. To raise a disparate treatment claim under the federal Equal Protection Clause, a plaintiff must allege that (1) he is similarly situated with other persons who were treated differently and (2) the difference in treatment was based on a constitutionally protected interest.[221] Plaintiff Bryant has not articulated any constitutionally protected interest upon which the treatment of Mr. Bryant was allegedly based.

A plaintiff may also allege a "classification" Equal Protection claim.[222] Courts recognize a subset of the classification cases known as "class of one" Equal

---

principles.").

[221] See, e.g., Personnel Adm'r of Mass. v. Feeney, 442 U.S. 256, 279 (1979).

[222] See, e.g., City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 446-47 (1985) (Equal Protection Clause requires State to treat all persons similarly situated alike or to avoid all classifications that are "arbitrary or irrational" and reflect "bare . . . desire to harm a politically unpopular group"); Lofton v. Secretary of Dep't of Children & Family Servs., 358 F.3d 804, 817 (11th Cir. 2004) ("The central mandate of the equal protection guarantee is that '[t]he sovereign may not draw distinctions between individuals based solely on differences that are irrelevant to a legitimate governmental objective.'").

Protection cases.[223]  In <u>Olech</u>, the Court stated that "[o]ur cases have recognized successful equal protection claims brought by a 'class of one,' where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment."[224] In <u>Griffin</u>, for example, the court considered (but ultimately rejected) a claim by a property owner who requested a connection to the municipal water supply and was told she would need to give the city an easement but where she claimed that other property owners getting a connection were not required to give an easement.[225] It also does not appear that Plaintiff Bryant is asserting a classification or "class-of-one" equal protection claim because there is no allegation that the Government acted against Mr. Bryant based on characteristics unique to him.

For the foregoing reasons, the court finds the discretionary function exception applies to the provision of a water supply at Camp Lejeune and therefore bars the Plaintiffs' negligence and related state law claims regarding the alleged contamination of the water supply.  The court GRANTS the Government's motion

---

[223]    <u>See</u>, <u>e.g.</u>, <u>Griffin Indus., Inc. v. Irvin</u>, 496 F.3d 1189, 1200-01 (11th Cir. 2007) (citing <u>Village of Willowbrook v. Olech</u>, 528 U.S. 562 (2000)).

[224]    <u>See</u> 528 U.S. at 564-65.

[225]    <u>See</u> 496 F.3d at 1203-07.

to dismiss on the basis of the discretionary function exception [62] and GRANTS the Government's motion to dismiss [127].

### D.    Remaining Procedural Requests

The Plaintiffs ask that the court establish (1) a Steering Committee, (2) set a schedule for the filing of an Administrative Master Complaint, an answer by the Government, and discovery.  The court previously found that due to the relatively small number of complaints filed in the MDL, it was not necessary at the origination of the MDL to file a Master Complaint.[226]  The court stated that after the resolution of the Feres and discretionary function exception issues, the court "will establish a procedure, if necessary, for the filing of an Administrative Master Complaint and assertion of defenses."[227]

Now that the court has considered all of the allegations in the Plaintiffs' complaints and proposed amended complaints, and has determined that the Plaintiffs cannot move forward, there is no need for any further proceedings.  Furthermore, the court DENIES AS MOOT the Government's motion for order relating to the preservation of documents and electronically stored information [37].

### E.    Pro Se Motions

---

[226]    See Doc. No. [24], at 6.

[227]    Id. at 7.

84

Three individual plaintiffs have been filing pro se motions with the court. To address some of these motions, it is necessary to review prior rulings made by the court in the early stages of this litigation.  On October 19, 2011, the court entered an order staying "any deadline the Government has to file a responsive pleading (such as an answer or motion to dismiss) in any case that is transferred to the Multidistrict Litigation while the parties are conducting discovery and briefing on the threshold jurisdictional issues."[228]  As the court was still addressing jurisdictional issues in this latest order, the Government's obligation to file responsive pleadings has still been stayed.

On October 17, 2013, the Judicial Panel on Multidistrict Litigation transferred the case of Johnston v. Administrator, Environmental Protection Agency, Civil Action No. 3:13-CV-10995 (S.D. W.Va.) to the MDL.[229]  Shortly thereafter, Mr. Johnston filed a motion to amend complaint.[230] The purpose of his proposed amendment is to increase the monetary relief sought from $5,000,000 to $10,000,000 due to a recent diagnosis of renal cancer.  Because the court has determined that the

---

[228]    See Doc. No. [21].

[229]    See Doc. No. [94].

[230]    See Doc. No. [97].

Plaintiffs' claims cannot go forward, the court DENIES AS MOOT Plaintiff Johnston's motion to amend [97].

Mr. James Douse filed a complaint in the Northern District of Georgia. On August 8, 2012, the court transferred that complaint to the Multidistrict Litigation.[231] On August 19, 2015, the court denied Mr. Douse's "motion for an indicative ruling" as the issues referenced by Mr. Douse in that motion at that time were pending on appeal before the Eleventh Circuit.[232] Mr. Douse filed a motion for reconsideration of that order. In his motion for reconsideration, Mr. Douse references the injuries suffered by him and his family allegedly due to water contamination at Camp Lejeune. Mr. Douse's motion for reconsideration addresses several of the same arguments made by other Plaintiffs as to the statute of repose and the issue of negligence under the Federal Tort Claims Act. For the same reasons as the court has given above, the court DENIES Mr. Douse's motion for reconsideration [117].

Mr. Douse also filed a motion to amend his complaint. In that motion, Mr. Douse states he wishes to amend his complaint to add the statement of Secretary of the Department of Veterans Affairs Bob McDonald concerning the ATSDR report on contamination of drinking water at Camp Lejeune, as well as several points of

---

[231]   See Doc. No. [86].

[232]   See Doc. No. [116].

procedural history in the litigation.  Mr. Douse also alleges that the Government committed "fraud" by hiding the contamination of the drinking water at Camp Lejeune.  He also adds arguments similar to those he raised in his motion for reconsideration.  For the same reasons as given above, the court DENIES AS MOOT Mr. Douse's motion to amend complaint [123].

Mr. Douse files a motion for punitive and exemplary damages due to the fact that the Government attached Mr. Douse's administrative complaint to the Government's opposition to Mr. Douse's motion to amend.  Mr. Douse claims the attachment of the administrative file is a violation of the Health Insurance Portability and Accountability Act ("HIPAA") and thus he is entitled to punitive and exemplary damages.  The Government responds that the attachment of the entire file was inadvertent.  The Government also notes that it requested that the Clerk's Office place Mr. Douse's administrative complaint under seal and this has been done.  The court finds that any exposure of information was inadvertent and for only a brief period of time.  Therefore, the court DENIES Plaintiff Douse's motion for punitive and exemplary damages [143]; and DENIES Plaintiff Douse's motion for additional award of damages, for relief based on Bivens, and for a protective order [156].

Mr. Andrew Straw has filed several motions for default judgment contending that the Government has not answered his complaint.  However, as the court

explained above, when this Multidistrict Litigation case was opened, the court made several procedural rulings to streamline the litigation. Significant to Mr. Straw's motions, the court directed the Government's obligation to answer the Plaintiffs' complaints was stayed until the court resolved the threshold legal issues discussed in this order. The court also limited discovery to only two issues – the <u>Feres</u> doctrine and the discretionary function exception. No other discovery was permitted until the court resolved the threshold issues it addressed above. Under the terms of the Case Management Order, the Government is not required to answer any Requests for Admission propounded by any Plaintiff. For this reason, the court DENIES Plaintiff Straw's motion for clerk's entry of default [121]; DENIES Plaintiff Straw's fourth motion for clerk's entry of default [169]; GRANTS the Government's motion for a protective order [172]; and DENIES Plaintiff Straw's first motion for clerk's entry of default [178].

Mr. Straw also filed a motion for permanent injunction, but this motion appears to address current conditions at Camp Lejeune and Mr. Straw is not a current resident. Thus, he does not have standing to seek any relief with respect to current conditions at Camp Lejeune. The court DENIES Plaintiff Straw's motion for permanent injunction [165]. Finally, Mr. Straw asks that the court refund his $400 filing fee in

this case because he has not received any justice.[233]  But Mr. Straw did not originally file this suit in the Northern District of Georgia; he filed it in the District Court for the Northern District of Illinois.  Moreover, he also states that courts have denied him in forma pauperis status and have determined that the cases he has filed are frivolous. Dissatisfaction with the rulings of the court is not a sufficient basis for seeking refund of a filing fee.  The court DENIES Plaintiff Straw's motion for refund and further relief [192].

## F.      Summary

The court has determined that it must follow the binding precedent of Bryant and concludes that the Plaintiffs' claims are barred by the ten-year statute of repose under North Carolina law.  Even if the claims were not barred by the statute of repose, the court also finds that any claims by service members that accrued during their time as service members are barred by the Feres doctrine.  Finally, the court also finds that there were no mandatory specific directives in the form of federal statute or regulations which removed discretion from government actors regarding the water supply at Camp Lejeune, and decisions relating to the disposal of contaminants, the provision of water on the base, and whether any base inhabitant should be warned are

---

[233]      See Doc. No. [192].

policy based decisions and the discretionary function exception applies, barring the Plaintiffs' claims.

Plaintiff Rivera contends that none of these rulings applies to his case because it was not transferred to the MDL until February 4, 2016, after the Government filed its latest motion to dismiss.[234]   The court notes that in its first Case Management Order, it stated that the order would "govern the practice and procedure in any tag-along actions transferred to this court by the Judicial Panel on Multidistrict Litigation."[235] But the court did not make any specific order as to whether substantive rulings on common issues would also control the tagalong cases.

Under the present circumstances, however, the court finds that the rulings it made here do apply to Plaintiff Rivera.   As an initial matter, Plaintiff Rivera is represented by the same counsel that represents Plaintiff Wright; and Plaintiff Rivera adopted the arguments of Plaintiff Wright in response to the Government's most recent motions.   Accordingly, Plaintiff Rivera did have an opportunity to respond. Furthermore, much of what the court has ordered here is a reflection of binding authority rendered by the United States Supreme Court and the Eleventh Circuit. Nothing Plaintiff Rivera argues now can change that binding precedent.   The court

---

[234]   <u>See</u> Doc. No. [159].

[235]   <u>See</u> Doc. No. [16], at 1.

rejected above an argument that allegations of fraud and concealment would toll the statute of repose.  As to the discretionary function and <u>Feres</u> rulings, the court ordered a specific discovery period and directed that the period of discovery would not be re-opened for later filed tagalong cases.[236] Thus, there cannot be new information from Plaintiff Rivera that would alter the court's conclusions as to the <u>Feres</u> doctrine and the discretionary function exception.

Although the court grants the Government's motions to dismiss, the court must also address the manner in which the cases should be dismissed.  A dismissal with prejudice applies to all claims disposed of under North Carolina's statute of repose, as well as the <u>Feres</u> doctrine.  The dismissal under the discretionary function exception requires more detailed discussion.  When the discretionary function exception applies, the court is without subject matter jurisdiction.  The Eleventh Circuit has held that a "dismissal for lack of subject matter jurisdiction is not a judgment on the merits and is entered without prejudice."[237]  The Ninth Circuit,

---

[236]    <u>See</u> Doc. No. [24], ¶ 2.

[237]    <u>See, e.g.</u>, <u>Stalley ex rel. United States v. Orlando Reg'l Healthcare Sys., Inc.</u>, 524 F.3d 1229 (11th Cir. 2008); <u>Stanley v. Central Intelligence Agency</u>, 639 F.2d 1146, 1157 (5th Cir. 1981) (internal citations omitted) ("[w]hen a court must dismiss a case for lack of jurisdiction, the court should not adjudicate the merits of the claim"); <u>see also</u> <u>Ashford v. United States</u>, 463 F. App'x 387, 395-96 (5th Cir. 2012) (holding that dismissal under discretionary function exception of FTCA on jurisdictional grounds and therefore is without prejudice and not judgment on merits); <u>Hart v. United States</u>, 630 F.3d 1085, 1091 (8th Cir. 2011) (same).

however, has recognized that the discretionary function exception has its roots in the sovereign immunity of the United States Government.  Therefore, in <u>Frigard v. United States</u>,[238] the court held that "[o]rdinarily, a case dismissed for lack of subject matter jurisdiction should be dismissed without prejudice so that a plaintiff may reassert his claims in a competent court, . . . however, the bar of sovereign immunity is absolute: no other court has the power to hear the case, nor can the [plaintiffs] redraft their claims to avoid the exceptions to the FTCA. Thus, the district court did not abuse its discretion in dismissing the action with prejudice."[239] The Eleventh Circuit touched on this issue in <u>Zelaya</u>, where it noted that the court has always considered issues of § 2680 to be jurisdictional, but noted as well that "we also recognize that in its recent jurisprudence, the Supreme Court has become more reluctant, when sanctioning the dismissal of some claims, to base its rejection on jurisdictional grounds, as opposed to a deficiency in the merits of the claim."[240]  But

---

[238]    862 F.2d 201 (9th Cir. 1988).

[239]    <u>Id.</u> at 204 (citation omitted).

[240]    781 F.3d at 1339; <u>see also</u> <u>Parrott v. United States</u>, 536 F.3d 629, 634 (7th Cir. 2008) (holding exceptions to United States' waiver of sovereign immunity, found in § 2680(a)-(n), "limit the breadth of the Government's waiver of sovereign immunity, but they do not accomplish this task by withdrawing subject-matter jurisdiction from the federal courts").

the viability of this theory might be in some doubt as a result of <u>Simmons v. Himmelreich</u>.[241]

There are additional concerns in this case that are unique. As the court explained above, this Multidistrict Litigation was established to handle all complaints filed concerning contamination of the water supply at Camp Lejeune. The court determined that certain threshold legal issues had to be addressed before proceeding to any extensive discovery or further development of the merits of the cases. Various courts have taken over five years to address those threshold issues and have reached the conclusion that CERCLA's statute of limitations period does not preempt North Carolina's statute of repose and that the statute of repose does not contain an exception for latent disease claims. Now, this court has also held that to the extent any claims remain after those rulings, the Government's actions with respect to the water supply at Camp Lejeune are covered by the discretionary function exception to the Federal Tort Claims Act. As explained above, the resulting lack of subject matter jurisdiction is a consequence of sovereign immunity and is not a situation where another court would potentially have subject-matter jurisdiction over the Plaintiffs' claims. Furthermore, the court has already considered all of the allegations raised by the Plaintiffs in their latest proposed amendments. Thus, there is no further

---

[241] ___ U.S. ___, 136 S. Ct. 1843 (2016) (holding FTCA's judgment bar does not apply to cases decided under discretionary function exception).

AO 72A
(Rev.8/82)

amendment to the Plaintiffs' complaints that would potentially allow this court – or any other – to exercise subject matter jurisdiction over the Plaintiffs' claims. Thus, although the court dismisses without prejudice under the discretionary function exception due to Eleventh Circuit precedent, for all practical purposes, there is no other forum where the Plaintiffs could bring these claims without meeting the same sovereign immunity obstacle under the discretionary function exception.

The court must now determine what remains to be done in this Multidistrict Litigation. The Government argues that once the court has determined it does not have subject matter jurisdiction over the Plaintiffs' claims, the court should dismiss the pending cases. The Plaintiffs respond that the appropriate action is remand of the cases back to the transferor courts.[242]

Under § 1407, "[e]ach action so transferred shall be remanded by the panel at or before the conclusion of such proceedings to the district from which it was transferred unless it shall have been previously terminated."[243] The court has terminated the causes of action and therefore, there is no need to recommend to the

---

[242]    This transfer is distinguished from the Plaintiffs' prior argument that the court should engage in a jurisdictional or venue-based transfer – an argument the court rejected above.

[243]    28 U.S.C. § 1407.

94

Judicial Panel that the cases be sent back to the originating districts.  The rules of the

Judicial Panel state that:

> Where the transferee district court terminates an action by valid order, including but not limited to summary judgment, judgment of dismissal and judgment upon stipulation, the transferee district court clerk shall transmit a copy of that order to the Clerk of the Panel.  The terminated action shall not be remanded to the transferor court and the transferee court shall retain the original files and records unless the transferee judge or the Panel directs otherwise.[244]

Accordingly, the court terminates this action without a suggestion of remand.

## III.    Conclusion

The court **DENIES AS MOOT** the Government's motion for order relating

to the preservation of documents and electronically stored information [37];

**GRANTS** the Government's motion to dismiss [61]; **GRANTS** the Government's

motion to dismiss for lack of subject-matter jurisdiction [62]; **DENIES AS MOOT**

the Plaintiffs' motion for oral argument [72]; **DENIES AS MOOT** Plaintiff Bryant's

motion to amend complaint [77]; **DENIES AS MOOT** the Plaintiffs' motion for

extension of time to complete discovery and to stay [83]; **DENIES AS MOOT**

Plaintiff Johnston's pro se motion to amend [97]; **DENIES** Plaintiff Douse's pro se

motion for reconsideration [117]; **DENIES** Plaintiff Straw's pro se motion for clerk's

entry of default [121]; **DENIES AS MOOT** Plaintiff Douse's pro se motion to

---

[244]      See Panel Rule 10.1(a).

amend [123]; **DENIES AS MOOT** Plaintiff Wright's motion to amend complaint [126]; **GRANTS** the Government's motion to dismiss all cases based on North Carolina statute of repose [127]; **DENIES** Plaintiff Douse's pro se motion for punitive and exemplary damages [143]; **DENIES AS MOOT** the Government's motion to strike [152]; **DENIES** Plaintiff Douse's pro se motion for additional award of damages, for relief based on Bivens, and for a protective order [156]; **DENIES AS MOOT** Plaintiff Bryant's supplemental motion to amend [164]; **DENIES** Plaintiff Straw's pro se motion for permanent injunction [165]; **DENIES** Plaintiff Straw's pro se fourth motion for clerk's entry of default [169]; **GRANTS** the Government's motion for protective order [172]; **DENIES** the Plaintiffs' motion to transfer pursuant to 28 U.S.C. § 1631 or motion for conditional suggestion of remand [176]; **DENIES** Plaintiff Straw's pro se first motion for clerk's entry of default [178]; **DENIES AS MOOT** the Plaintiffs' motion for a hearing [188]; and **DENIES** Plaintiff Straw's pro se motion for refund and further relief [192].

The Clerk of the Court is DIRECTED to DISMISS this action.

SO ORDERED, this 5 day of December, 2016.


/s/Thomas W. Thrash
THOMAS W. THRASH, JR.
United States District Judge